12 So.3d 363 (2009)
Jimmy LEWIS
v.
ODECO, INC., Murphy Exploration and Production Company and Diamond Offshore Drilling Company.
Jimmy Lewis
v.
Odeco, Inc., Murphy Exploration and Production Company and Diamond Offshore Drilling Company.
Nos. 2007-CA-0497, 2007-CA-1566.
Court of Appeal of Louisiana, Fourth Circuit.
April 8, 2009.
Opinion Granting Rehearing in Part and Denying Rehearing in Part May 27, 2009.
*366 J. Van Robichaux, Jr., Vance E. Ellefson, Robichaux Law Firm, New Orleans, LA, for Plaintiff/Appellee.
Michael P. Mentz, Alayne R. Corcoran, Hailey McNamara Hall Larmann & Papale, L.L.P., Metairie, LA and Antonio Clayton, Clayton Law Firm, Port Allen, LA, for Defendant/Appellant, Diamond Offshore Drilling, Inc.
(Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY).
MICHAEL E. KIRBY, Judge.
In this consolidated case, the defendant, Diamond Offshore Drilling Incorporated (hereinafter referred to as "Diamond"), appeals three trial court judgments: 1) the December 5, 2006 judgment in favor of plaintiff, Jimmy Lewis, and against Diamond in the amount of $7,147,601.60, plus interest and costs of the proceedings; 2) The February 5, 2007 judgment denying Diamond's motion to annul judgment, motion for new trial or, alternatively, motion for judgment notwithstanding the verdict and motion to conform the judgment with the verdict and/or motion to amend the judgment; and 3) the October 5, 2007 judgment taxing costs for plaintiff's expert witnesses against Diamond. Plaintiff has answered the appeal regarding the December 5, 2006 and February 5, 2007 judgments.
On March 31, 1997, plaintiff filed a seaman's petition against defendants ODECO, *367 Inc., Murphy Exploration and Production Company, Diamond and their insurers for damages allegedly incurred by plaintiff while employed by defendants as a seaman, mechanic and member of the crew of the jack-up rig, Ocean Spartan. Plaintiff alleges that ODECO and/or Murphy Exploration and/or Diamond owned, operated, maintained, and/or controlled the Ocean Spartan in the territorial waters of the Country of Venezuela at all pertinent times. Plaintiff's petition states that state court jurisdiction was being invoked pursuant to the Jones Act, the General Maritime Law of the United States of America, the Savings to Suitors Clause, 28 U.S.C. § 1333, et seq., and any applicable general statute and/or federal jurisprudence and law.
In his original petition, plaintiff alleges that in May 1994, while in the service of the vessel, he became seriously ill when he was exposed to and ingested contaminated food and/or water, and contracted the disease sporadic inclusion body myositis ("SIBM"). He alleged that the cause of his illness and damages was the negligent acts and omissions of the master and crew of the Ocean Spartan, the unseaworthiness of the vessel, and the failure of defendants to furnish plaintiff with a safe place to work, safe food and water, appropriate inoculations, an adequate and competent crew, and prompt medical attention. Plaintiff further alleges that as a result of his illness, he has required painful and extensive medical treatment, has suffered severe pain and mental anguish, has become permanently disabled from working and severely handicapped in his other activities, and has lost earning capacity and the enjoyment of life's pleasures. Plaintiff alleges that defendants had, and continue to have, an obligation to provide him with maintenance and cure.
Plaintiff filed a first supplemental and amending petition on May 23, 2000. In that petition, he amended the original petition to allege that his illness was also the result of unprotected exposures to various chemicals. He further alleged that this exposure to toxic chemicals was a proximate and legal cause of his illness and damages.
Plaintiff filed a second supplemental and amending petition on May 12, 2004. In that petition, plaintiff alleged that while working for defendants as a member of the crew of the Ocean Spartan, he was forced to work eighteen hour days in 100 plus degree temperatures and high humidity, during which he was continually exposed to heavy metals, poisons and toxic chemicals, including but not limited to arsenic, mercury, lead and antimony, as well as contaminated and impure food and water. As a result of these working conditions, plaintiff alleged that his system was debilitated and his resistance weakened, making him more susceptible to injury, illness and disease. He further alleged that the damage to his body and nervous system has resulted in his being effectively paralyzed and confined to a wheelchair. In addition to the other allegations made against defendants in the original and first supplemental and amending petitions, plaintiff also alleged that defendants were arbitrary and capricious in their refusal to provide maintenance and cure. He further alleged that defendants' continued failure and refusal to produce any information that would assist plaintiff's diagnosis contributed to his damages.
Upon joint motion of plaintiff and defendants ODECO, Inc. and Murphy Exploration and Production Co., the trial court dismissed plaintiff's claims against those two defendants by order dated October 11, 2004. Plaintiff did not release Diamond and specifically reserved his rights against *368 that defendant. A jury trial was held in this matter in November 2006 between plaintiff and the only remaining defendant, Diamond. The jury interrogatories show that the jury found Diamond negligent under the Jones Act, and that the negligence was a cause in the development of plaintiff's condition. The jury also found that the vessel, Ocean Spartan, was unseaworthy, but that the unseaworthiness was not a proximate cause of plaintiff's condition. The jury found that plaintiff's condition arose while he was in the service of the Ocean Spartan, and that he was entitled to damages in the amount of $5,409,655.00, in addition to maintenance in the amount of $27,116.00 and cure in the amount of $1,710,830.60. The jury found that plaintiff was not damaged as a result of Diamond's unreasonable failure to pay him maintenance and cure, and awarded plaintiff no damages for the withholding of maintenance and cure.
On December 5, 2006, the trial court rendered judgment in favor of plaintiff, Jimmy Lewis, and against Diamond in the amount of $7,147,601.60, plus interest and costs of the proceedings. Diamond filed a motion to annul the judgment and a motion for new trial or, in the alternative, judgment notwithstanding the verdict and motion to conform the judgment to the verdict and/or motion to amend the judgment and to set expert fees. On February 5, 2007, the trial court rendered judgment denying all of Diamond's motions except for the motion to set expert fees, which the trial court took under advisement. The trial court rendered judgment on the issue of expert fees on October 5, 2007. In that judgment, the trial court taxed costs for plaintiff's expert witnesses against Diamond. Diamond appealed, and plaintiff answered the appeal as to the December 5, 2006 and February 5, 2007 judgments.
Before addressing the numerous assignments of error raised by Diamond, we note that plaintiff filed an answer to the appeal alleging additional errors on the part of the trial court. However, these assignments of error were not briefed, and are considered abandoned. See Uniform RulesCourts of Appeal, Rule 2-12.4; Folse v. Gulf Tran, Inc., XXXX-XXXX (La. App. 1 Cir. 2/23/04), 873 So.2d 718.
In Diamond's first assignment of error, it argues that the trial court violated Rule 9.5 of the Rules for Civil Proceedings in District Courts. Rule 9.5 states:
All judgments, orders, and rulings requiring the court's signature must either be presented to the judge for signature when rendered or, if presented later, contain the typewritten name of the judge who rendered the judgment, order or ruling.
If presented later, the responsible attorney or the unrepresented party must circulate the proposed judgment, order or ruling to counsel for all parties and to unrepresented parties and allow at least three working days for comment before presentation to the court. When submitted, the proposed judgment, order or ruling must be accompanied by a certificate regarding the date or mailing, hand delivery or other method of delivery of the document to other counsel of record and to unrepresented parties, and stating whether any opposition was received.
This rule does not apply to default judgments.
Diamond asserts that the trial court instructed plaintiff's counsel to prepare and submit a judgment following trial. Diamond further alleges that it did not receive the proposed judgment prior to the court's signing of the judgment, and the judgment was not accompanied by a certificate reflecting the date of mailing or method of *369 delivery of the same. In response, plaintiff's counsel does not dispute these assertions by defense counsel. He states that he hand-delivered the proposed judgment to the judge's office before filing it because the judge "was leaving town for a week and action was necessary to place the judgment on the record." Plaintiff's counsel further states that Diamond made no comment on the judgment when it filed its motion to annul based on Rule 9.5.
Plaintiff's counsel's response does not dispute or even address the fact that Diamond was not given an opportunity to comment on the proposed judgment before it was presented to the trial court for signature. Plaintiff's counsel's does not offer an acceptable explanation for his actions, and we find his failure to comply with Rule 9.5 troubling. Furthermore, we find error on the part of the trial court in signing a judgment without certification that the provisions of Rule 9.5 had been followed. However, in these particular circumstances, we find this error to be harmless in that the non-compliance with Rule 9.5 did not affect the result in this case because the trial court simply adopted the jury's verdict in its judgment.
Diamond next argues that the trial court erred in admitting the testimony of plaintiff's medical experts following a Daubert hearing. Prior to trial, Diamond filed motions in limine to exclude the testimony of plaintiff's purported experts, Dr. James Carter and Dr. Russell Jaffe. In these motions, Diamond argued that neither Dr. Carter nor Dr. Jaffe is qualified by education or experience to offer expert testimony in this matter. Thus, Diamond argued that the testimony of Dr. Carter and Dr. Jaffe is not admissible under Louisiana Code of Evidence article 702, and lacks the indicia of relevance and evidentiary reliability required under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Foret, 628 So.2d 1116 (La. 1993), and should be excluded as a matter of law.
At the beginning of trial, the trial court ruled on Diamond's motions in limine to exclude the testimony of Drs. Carter and Jaffe. The Court denied Diamond's motion in limine to exclude the testimony of Dr. Jaffe, and Diamond applied for emergency supervisory writs with this Court as to Dr. Jaffe only. On November 14, 2006, this Court, in 2006-C-1485, denied Diamond's writ application, finding no abuse of the trial court's discretion. With regard to the motion in limine to exclude the testimony of Dr. Carter, the trial court ruled it was not accepting Dr. Carter as an expert in the causes of SIBM, but that Dr. Carter would be allowed to testify as to his treatment of plaintiff. Prior to ruling, the trial court referred to an earlier hearing on Diamond's Daubert motions, but the appeal record does not include a transcript of that proceeding.
On appeal, Diamond argues that the trial court erred in its rulings on the motions in limine to exclude the testimony of Drs. Carter and Jaffe.[1] As stated above, this Court denied the motion to exclude the testimony of Dr. Jaffe, finding that the trial court did not abuse its discretion. Plaintiff argues that this ruling is now the law of the case and should not be reconsidered. In Delta Chemical Corp., v. Lynch, XXXX-XXXX, p. 8 (La.App. 4 Cir. 2/27/08), *370 979 So.2d 579, 585, this Court set forth the law regarding the law of the case doctrine as follows:
In Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 330, 256 So.2d 105, 107 (La.1972), the Supreme Court stated:
With regard to an appellate court, the "law of the case" refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.
Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.

See also, Zatarain v. WDSU-Television, Inc., 95-2600, p. 10 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1186 ("This court generally applies the `law of the case' doctrine when reviewing an issue decided on supervisory writs as part of the appeal of the case following a trial on the merits, except when it finds either that the previous decision is based on palpable error or that manifest injustice would result.").
Both plaintiff and Diamond were parties to this case when the issue of Dr. Jaffe's testimony was decided on supervisory writs. We do not find that the previous decision was based on palpable error or that manifest injustice would result if the law of the case doctrine is applied. Therefore, we find that the law of the case doctrine applies as to this Court's decision that the trial court did not abuse its discretion in denying the motion in limine to exclude the testimony of Dr. Jaffe.
With regard to the trial court ruling regarding Dr. Carter's testimony, we find no abuse of discretion in the trial court's decision to limit Dr. Carter's testimony to his treatment of plaintiff. The trial court ruled that Dr. Carter could not testify as to the cause of SIBM, and Dr. Carter confirmed his lack of knowledge as to the cause of SIBM in his trial testimony. We do not find that the trial court abused its discretion in its ruling as to the areas to which Dr. Carter could and could not testify.
This assignment of error has no merit.
Diamond next argues that there is no evidence of Jones Act negligence in this case, that plaintiff did not carry his burden of proving that his SIBM was caused by exposure to heavy metals or his employment with Diamond, and that the finding of causation was contrary to the evidence. It is undisputed that plaintiff has SIBM. What is disputed is whether or not plaintiff contracted this disease and other illnesses during his employment with Diamond.
In George v. Delta Queen Steamboat Co., XXXX-XXXX, pp. 10-11 (La.App. 4 Cir. 9/10/03), 854 So.2d 476, 482-483, this Court summarized the legal standard for determining negligence under the Jones Act as follows:

*371 Federal jurisprudence in 1997 clarified that seamen in Jones Act negligence cases are bound to the standard of ordinary prudence, not to a lesser standard of care; i.e., according to the court, Jones Act seamen are required to act as reasonable seamen under the circumstances. Similarly, Jones Act employers are not held to a higher standard of care than ordinary negligence, but are required to act as reasonable employers under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997). Inconsistent federal jurisprudence was overruled by that decision.
A year later, the Louisiana Supreme Court adopted the above standard concerning Jones Act negligence enunciated in Gautreaux and stated:
The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances.

Foster v. Destin Trading Corp[.], 95-226 at pp. 3-4 (La.5/30/97), 700 So.2d 199, 208 (on rehearing) (citations omitted).
Additionally, the court in the same case reiterated the standard for unseaworthiness:
The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable. It extends to a defective condition of the ship, its equipment, or appurtenances. A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party.
Id. at p. 5-6, 700 So.2d at 209 (citations omitted).
Diamond purchased the Ocean Spartan from ODECO in January 1992. At trial, the plaintiff testified that he worked as a motorman on the Ocean Spartan in the Gulf of Mexico starting in 1988, and became a mechanic in 1992 or 1993. He worked on this vessel when it was moved to Venezuela in February 1991, and worked on the vessel in Venezuela for three years. He was diagnosed with SIBM in early 1996. When the vessel went to Venezuela, plaintiff worked 28 days on and 28 days off. Each time he would arrive back on the rig, he began to have diarrhea, which would continue until he went home and then stop three to four days after he arrived home.
Plaintiff testified that the drinking water generated from the Alpha Laval water system tasted bad. He said Lake Maracaibo, where the vessel was located, was polluted. Plaintiff testified that some of the drinking water on the vessel was delivered by barge, but drinking water was also generated from an Alpha Laval "water maker." Plaintiff stated that water from the lake was used in the water system. He took samples of lake water to be tested, but admitted that he never saw any test results.
He said that at times the crew had no other water source to drink other than water from the water system. He said the temperature on the decks ranged from *372 103 to 110 degrees except for the days that it rained. He said that once he became a mechanic, he tried to correct the problems with the water system. Plaintiff also testified that his job involved working in and around the mud pit room. He said that "mud" is the term used for drilling fluid. He said the temperature in the mud pit room could get as high as 160 degrees. Plaintiff said he worked on the Ocean Spartan when it returned from Venezuela until May 1996 when his doctor advised him to quit working because of his worsening condition. He began to use a wheelchair in the early part of 1999.
On cross-examination, plaintiff testified that he did not know he was ill in 1991, but that he started to "tire out" in 1991. He would not admit to telling several doctors that his illness began in 1991. He stated that his doctors told him that his diarrhea-related issues were not related to his SIBM. While on the Ocean Spartan in Venezuela, he never heard anyone say that the water was not adequate for consumption. When asked about his allegation in his original petition that ODECO and Murphy Oil were responsible for his illness, his response was that he did not know at that time whether the responsible party was ODECO, Murphy Oil or the new company named Diamond Offshore.
Dennis Bailey, who helped create safety training manuals and safe drilling operations manuals for Diamond, testified that he inspected the Ocean Spartan when it was in Venezuela on only one occasion, and that was in 1991. He stated that the safety inspections conducted by Diamond did not include inspections of the water system. He said a rig mechanic is not supposed to mix chemicals.
Billy Plaisance, a driller on the Ocean Spartan in 1992, testified that oil-based drilling mud would spill onto the drilling floor during the course of operations. He said he had no knowledge that oil-based muds were washed overboard, but he knew that water-based muds, including some with diesel in them, were washed overboard into the lake.
James Chatham, an assistant driller on the Ocean Spartan, also testified that water-based mud was dumped in the lake, regardless of whether or not it contained diesel. Mr. Chatham testified that Soltex was one of the products used on the Ocean Spartan in Venezuela. He also testified that it was common knowledge that Lake Maracaibo was polluted, and that he could see that it was polluted. He stated that he had diarrhea when in Venezuela, but it would stop three to four days after he returned home.
Terry Petty, who was accepted as an expert in the operation of drilling rigs and petroleum engineering, testified that he conducted an investigation of the Alpha Laval water system at plaintiff's request. He said the water system is a distillation system that removes salt and some pollutants from raw water. He stated that the manufacturer of the system gave a specific warning that fresh water must not be produced from polluted water because such water can be unsuitable for human consumption.
Wade Reason, the Diamond rig superintendent who traveled with the Ocean Spartan to Venezuela, testified that lake water was never pumped directly into the potable water tanks when he was in Venezuela. But Mr. Reason testified on cross-examination that he worked 28 days on and 28 days off so he could only answer that question as to the time he was aboard the vessel. His understanding was that Lake Maracaibo was polluted. As to the disposal of oil-based mud, Mr. Reason testified that most of it was placed on the barge and the rest of it was washed and dumped overboard. He said that neither motormen *373 nor mechanics mix chemicals or handle the drilling mud additives.
The defense also presented the testimony of Calvin Barnhill, who was recognized as an expert in petroleum engineering. He was hired as a consultant by Diamond for this case, and was asked to review drilling reports and other information for the time period Diamond owned the Ocean Spartan. According to those reports, he said it "looks like" there were two wells that used oil-based mud, and that plaintiff was on the rig for 20 days while one of those wells was drilled in 1992 and for 28 days while the other well was drilled in 1993. He said he obtained this information from reports kept by Diamond. He said the drilling operations conducted in Lake Maracaibo, Venezuela were normal, routine drilling operations.
Mr. Barnhill testified that he found nothing out of the ordinary in the way drilling muds were used while the Ocean Spartan was in Venezuela. He stated that he is familiar with the drilling additive, Soltex, and he is not aware of any hazards regarding heavy metal exposure in the use of that product. He stated that the muds used onboard the Ocean Spartan were classified as non-hazardous oil field materials. On cross-examination, Mr. Barnhill stated that the mixing and treatment of certain chemicals in drilling fluids can be considered pollutants, depending on the levels and the methods of disposal. He acknowledged that he has not measured the amounts of chemicals in the oil fluids and drilling waste.
Joseph Wood, an expert in industrial hygiene, testified that the safety programs in place on the Ocean Spartan while in Venezuela were adequate. He said Soltex has been used in the drilling industry for a long time. He said Soltex contains no hazardous warnings for heavy metals. He did not know all of the components contained in Soltex. He said he had no way of knowing if heavy metals were in a drilling mud unless he tested it, and he said he has not tested drilling muds.
Felix Nowell, worked as a motorman on the Ocean Spartan when it moved to Venezuela. He said as a motorman, he did not have to mix chemicals in the mud pit room. He said one of his responsibilities was taking care of the water maker. He said he worked on the Alpha Laval water system. When it was first installed, he sent samples of the water in the system to be tested, and no one ever indicated to him that the water was unsafe for consumption. He said that water used in the water system came from "deep wells," which he described as a saltwater tower. He said he drank the water from the system and had no problems. He had no knowledge as to whether lake water flowed directly into the potable water tank. On cross-examination, Mr. Nowell said he was only on the Ocean Spartan in Venezuela for a short while, leaving in July 1991 to work on another rig.
The following is a summary of the expert medical testimony presented at trial.

Dr. James Carter
Dr. James Carter, a pediatrician and nutritionist, was accepted by the trial court as an expert in the areas of tropical medicine, heavy metal and its effects on the body, public health and nutrition, and integrated medicine. As stated above, the trial court did not accept him as an expert in the causes of SIBM. The court only allowed Dr. Carter to testify as to his treatment of plaintiff.
Dr. Carter testified that he first saw plaintiff on November 11, 2002, and as of the trial date, was still treating plaintiff on a continuing basis. Plaintiff's medical records showed that he had been diagnosed with SIBM and malignant hypertension. *374 Plaintiff was referred to Dr. Carter to check for heavy metal toxicity. Dr. Carter noted that plaintiff had been checked for gastrointestinal distress, specifically diarrhea, which cleared up each time he left Venezuela and would recur each time he returned to Venezuela.
Dr. Carter tested plaintiff for heavy metals, and found metals that are present in a common additive to drilling fluid called Soltex. Those metals include antimony, arsenic, cadmium, cobalt, lead, mercury, nickel and zinc. Plaintiff had high levels of each of these metals in his system. Dr. Carter's opinion is that it is more likely than not that the concentration of heavy metals came from drilling fluids. He treated plaintiff with a chelating medication called EDTA, which he described as a substance that goes into the body, grabs hold of metals and is excreted through the kidneys along with the metals attached to it. Dr. Carter said plaintiff showed progress with chelation therapy in that his mercury levels have fallen. His opinion is that plaintiff needs to continue chelation therapy in order to eliminate all of the metals from his system. His opinion is that plaintiff needs chelation therapy in combination with hyperbaric oxygen treatments he was receiving from Dr. Paul Harch.
Dr. Carter admitted that he does not know the cause of SIBM. But after reviewing plaintiff's medical records, he stated that there is a "suggestion" that he also has oxidative toxic stress at the cellular level, and that this can be caused by metals. When asked if it is his opinion that plaintiff's exposure to heavy metals in Venezuela caused his cells to not be able to do the normal things that they would otherwise be able to do, Dr. Carter responded:
Well, I think the exposure to metals again is the flagship that he may have been exposed to other environmental chemicals as well. But the exposure to metals is something we can measure. It does explain in part this gastrointestinal distress and how it comes and goes and that it is not an infectious illness that stops at the border, as I said earlier. It does explain the lead associated with hypertension. There's just no proof that those metals caused this Inclusion Body Myositis or adult muscular dystrophy. It's a case of guilt by association.
However, Dr. Carter then stated that environmental, chemical and heavy metal contamination that plaintiff was exposed to in Venezuela while working for Diamond is the most likely cause of all of plaintiff's illnesses.
On cross-examination, Dr. Carter testified that he got involved in plaintiff's treatment five years after this lawsuit was filed. He admitted he had not been to the rig where plaintiff worked and has no documentation as to what plaintiff's metal levels were when he was working in Venezuela. He also stated that plaintiff's mercury levels were normal in 1998. Dr. Carter testified that "in all likelihood" plaintiff got mercury in his system from working on the rig because mercury was in the drilling fluid additive used on the rig. When asked what his source was for his conclusion that mercury was in the drilling fluid additive, he responded that his information was from "several articles." He confirmed his earlier opinion stated in his deposition that Dr. King Engel is the world-renowned expert in SIBM, and that he would defer to his opinions on that disease. But when asked if he would defer to Dr. Engel if Dr. Engel disagreed with his opinion about metals in drilling fluid causing plaintiff's illnesses, Dr. Carter said he would not agree with that because he was dealing with the specifics of plaintiff's case, while Dr. Engel's opinions was of a more general nature.

*375 Dr. Paul Harch

Dr. Paul Harch was accepted as an expert in the fields of emergency medicine and hyperbaric treatment. Dr. Harch testified that plaintiff was referred to him for treatment by Dr. James Carter in early 2005. Dr. Harch first evaluated plaintiff on March 29, 2005. He treated plaintiff with hyperbaric oxygen therapy in an attempt to improve his SIBM. Plaintiff received forty treatments, and showed improvement. Plaintiff was videotaped before and after the treatments, and these videotapes were introduced into evidence. Dr. Harch's opinion is that the hyperbaric treatments helped plaintiff, and will continue to help him if he has more of these treatments. Dr. Harch admitted that he did not know of any other case where hyperbaric oxygen therapy was used for SIBM.
On cross-examination, Dr. Harch stated that plaintiff was the first patient he had ever seen with this disease. He also testified that plaintiff reported to him that his symptoms first appeared in late 1991.

Dr. John Olsen
Dr. John Olsen, an expert in the field of neurology, testified that he first saw plaintiff on October 5, 2006. On that visit, Dr. Olsen found that plaintiff had significant long-term damage from a myopathic process that looks like SIBM, but he noted that plaintiff's case is atypical. He stated that there is no well-defined etiology for this disease. Dr. Olsen said that specific treatment for SIBM is not available, but symptomatic treatment is available. He noted that the videotape recordings made while plaintiff received hyperbaric oxygen treatment from Dr. Harch showed that plaintiff had some response to this treatment but the improvement is only transient. He said he does not expect plaintiff to be cured of SIBM. Dr. Olsen said that cases of this disease are very rare, and he was unable to say what caused plaintiff's SIBM. When asked if plaintiff's weakness and gastrointestinal symptoms could have been caused when he was working off the coast of Venezuela, Dr. Olsen stated:
I think he was exposed to something, you know; and I think it was probably down there. Okay? That's what I think. Could I be wrong? Yes, I could be wrong.
On cross-examination, Dr. Olsen admitted that before his treatment of plaintiff, he was not sure he had ever seen SIBM. He acknowledged that SIBM is a progressive disease, and by the time a person recognizes the symptoms, they have usually had the disease "for a time." Plaintiff related to Dr. Olsen that he became symptomatic in late 1991. Dr. Olsen stated that no one knows what triggers SIBM.

Dr. Russell Jaffe
The deposition of Dr. Russell Jaffe was read into the record. The trial court recognized Dr. Jaffe as an expert in the fields of internal medicine, biochemistry, pathology, chemical immunology and clinical nutrition. Dr. Jaffe testified that he received plaintiff's medical records from Dr. Carter. He stated that he is the director of a laboratory in which he is the majority owner, but he does not have a medical practice. He has never seen plaintiff.
Based on his review of plaintiff's records and consultation with Dr. Carter, Dr. Jaffe stated his opinion that plaintiff was exposed to toxicants prior to working on the Ocean Spartan, but this prior exposure was not the cause of plaintiff's medical condition. His opinion was that the combination of lack of nutrients and the presence of bad toxicants in the working conditions on the Ocean Spartan exposed plaintiff to a heat shock stress that depressed his body's ability to neutralize the bad toxic minerals and/or pesticides to *376 which he was exposed. He suggested that hyperbaric oxygen therapy in combination with antioxidant therapy would be appropriate treatment for plaintiff's condition.
Dr. Jaffe stated that plaintiff's case is the first time he has ever been consulted regarding SIBM. He said that patients with SIBM are customarily treated by neurologists, and he is not a neurologist. When asked if he has found any credible scientific studies that relate SIBM to any particular cause, his response was, "[t]here are hypotheses." He further stated that he does not believe anyone in the world asserts that they know the cause of SIBM. He stated that he is not aware of any credible scientific studies that established that heavy metal exposure causes SIBM. Dr. Jaffe qualified that statement by saying that he has found strong evidence that exposure to certain toxic metals at the level plaintiff was allegedly exposed to, at a time when he was distressed because of heat shock exposure, would have reduced his innate protective antitoxic mineral production and made him susceptible to toxic metal accumulation. He further stated that toxic metal accumulation inside the mitochondria (described as independent organisms living inside cells) causes death to the mitochondria, and a dead mitochondria becomes an inclusion body.
Dr. Jaffe testified that the muscle weakness reported by plaintiff in 1991 may or may not have been related to his SIBM. Based on the medical histories he was provided, he stated that plaintiff began experiencing symptoms of SIBM in 1992. He could not say with a reasonable degree of medical certainty that plaintiff had SIBM before his diagnosis in 1994 or 1995. He said the latency period for SIBM is usually long, and can be anywhere from a few months to decades. However, he said plaintiff's case is atypical because the onset of the disease was at age 35, which is a young age for onset, and was fairly aggressive. Dr. Jaffe stated that he has not been involved with any studies regarding the treatment of patients with SIBM. He admitted that one hypothesis he considered was that plaintiff's illness may have occurred over 20 years. He said his first hypothesis was that plaintiff's illness was a slowly progressive condition that finally came to attention in 1994 or 1995. He said he later excluded this hypothesis after learning that plaintiff's condition progressed rapidly between 1991 and 1995. He said the rapid progression of plaintiff's illness caused him to conclude that his exposure to toxic chemicals while working on the Ocean Spartan was "a sufficient predisposing cause" of his illness.
On the subject of heat shock, Dr. Jaffe defined this condition as exposure to temperatures in excess of 140 degrees for a significant period of times, typically minutes. He said it was his understanding that plaintiff was exposed to temperatures in excess of 140 degrees while working in the mud room or pit on the Ocean Spartan. However, he admitted he had no personal knowledge that plaintiff was working in these conditions. Rather, he received this information from Dr. Carter. Dr. Jaffe said the relevance of heat shock to this case is that if he were exposed to this type of hot environment, it would reduce his body's ability to produce protective antitoxic molecules and would make him much more at risk of accumulation and toxic effects from the same toxicants that he might have been exposed to before at low levels. He also stated that it was his understanding that plaintiff was exposed to toxic metals and persisting organic dilutants such as pesticides while working on the Ocean Spartan. He acknowledged that plaintiff's history showed that he also used pesticides at his home.
*377 He said his conclusion that heat shock, followed by chronic low level exposure to toxic metals and pesticides, is part of the cause of SIBM is a hypothesis that has not been confirmed. He then stated that his opinion is that plaintiff would not have acquired SIBM if he had not been employed on the Ocean Spartan off the coast of Venezuela. Dr. Jaffe confirmed that there is no known cure for SIBM, and that he has seen no evidence that heat shock alone causes SIBM. It is Dr. Jaffe's opinion that Dr. Carter's differential diagnosis, treatment plan and opinion as to the causes of plaintiff's illness are correct. He stated that he was relying on the accuracy of information given to him by Dr. Carter in reaching his medical opinion in this case.
Dr. Jaffe stated that he believes plaintiff's condition has improved as a result of a combination of hyperbaric oxygen therapy treatments, treatments provided by Dr. Carter to rid plaintiff's body of toxins and dietary management. His opinion is that plaintiff will continue to improve if this course of treatment is followed. Dr. Jaffe's opinion is that if this course of treatment had been started when plaintiff was first diagnosed with SIBM, his physical condition would be considerably better, and he would have less disability. He said that his opinion is that plaintiff would not be wheelchair-bound if the appropriate medical therapy had begun closer to the time of his diagnosis. Dr. Jaffe stated that it is his considered medical opinion that the conditions under which plaintiff worked on the Ocean Spartan contributed to the cause of his current medical problem. However, he later admitted that he is not aware of any credible scientific evidence that SIBM is caused by heavy metal exposure or is effectively treated by hyperbaric treatment or removal of toxic metals.

Dr. John England
Dr. John England, recognized by the trial court as an expert in the field of neurology, testified by videotaped deposition. Dr. England has a subspecialty in neuromuscular disease, which encompasses treatment of individuals with SIBM. He stated that he evaluated plaintiff in August 1999. Dr. England described SIBM as being slowly progressive in most cases. He testified that SIBM has no known causes, only hypotheses and theories. He also testified that SIBM has no known cure. He said that by the time most patients have been diagnosed with SIBM, they have most likely had the disease for several years. Plaintiff's SIBM was diagnosed in 1995 by muscle biopsy, but plaintiff's medical history indicated that the onset of muscle weakness was in 1991. Dr. England stated that when a patient with SIBM first recognizes muscle weakness, then the disease has been present in the individual for a period of time, typically four to five years.
During the time period when Dr. England saw plaintiff, plaintiff's condition continuously deteriorated with no improvement despite treatments he was receiving from other physicians. He testified that there is no scientific or medical evidence to suggest that being a mechanic on an offshore drilling rig would have anything to do with the development of SIBM. He said there is no evidence that SIBM is related to any known environmental factor, occupational or otherwise. Dr. England stated that there is no credible scientific evidence that chelation therapy or hyperbaric chamber treatment helps SIBM. He further stated that he is not aware of any scientific medical studies that conclude that exposure to mercury causes SIBM. He said while heavy metal intoxication can cause problems in the nervous system, there are no reports of heavy metal intoxication causing direct effects on muscle. He further stated that mercury, in and of itself, *378 does not usually cause nerve or muscle problems. He said the current scientific conclusion is there are no effective treatments for SIBM.

Dr. John A. Sumner
Dr. John Sumner was accepted by the trial court as an expert in the field of neurology. He testified that he has a subspecialty in neuromuscular disease, including the disease of SIBM. He said he has diagnosed and treated patients with SIBM. Dr. Sumner examined plaintiff one time after he was already diagnosed with this disease. He said the cause of SIBM is unknown. He stated that plaintiff developed SIBM at age 35, which is early onset for this disease, but his SIBM was typical other than for the factor of early onset. Plaintiff told Dr. Sumner that he recognized his symptoms in 1991. Dr. Sumner testified that SIBM is usually a slowly progressive disease, and a person usually has the disease for a period of time before the symptoms are recognized. His opinion, based on his research, is that by the time a person with SIBM becomes wheelchair-bound, he or she has had the disease for a minimum of ten years, and typically many more years than that. Plaintiff first recognized muscle weakness in 1991 and starting using a wheelchair in 1996. Dr. Sumner's conclusion is that plaintiff's SIBM had been present since at least 1986.
Dr. Sumner stated that there is no known cure or demonstrated effective treatment for SIBM, and no scientific evidence that chelation therapy or hyperbaric oxygen treatment are effective treatments or cures for this disease. He also stated that there is no scientific evidence that heavy metal exposure causes SIBM. Dr. Sumner reviewed plaintiff's medical records and concluded that plaintiff did not have symptoms of heavy metal poisoning.

Dr. King Engel
Dr. King Engel, an expert in neurology and neuromuscular diseases, testified by videotaped deposition. He is the author of a book entitled, "Inclusion-Body Myositis and Myopathies," published in 1998 by Cambridge University Press. He stated that the causes of SIBM are unknown, and there is no known cure. Dr. Engel first saw plaintiff in June 1998. Plaintiff told him that he had progressive weakness in all four limbs since late 1992, and his weakness has worsened to the point where he has difficulty swallowing solid food. Dr. Engel performed a muscle biopsy, and confirmed plaintiff's diagnosis of SIBM. Plaintiff reported to Dr. Engel that he had received four courses of intravenous immunoglobulin starting in April 1996. Dr. Engel recommended two kinds of oral treatment, Carnitine and Co-Q-10, along with prednisone. He explained that Carnitine and Co-Q-10 are normal substances in our bodies, and are especially useful to mitochondrial function. He recommended these substances, which are available at health food stores without a prescription, because in SIBM patients, the mitochondria are abnormal. He said these medications can be helpful in assisting in symptomatic control.
Dr. Engel said it is fairly common for SIBM patients to have difficulty swallowing, but gastrointestinal problems such as diarrhea and upset stomach are not symptoms commonly seen in SIBM patients. He stated that his hypothesis regarding plaintiff's case is the existence of a virus in his system. He said his hypothesis was the probable but unproven cause of plaintiff's SIBM because no viral agent has been found in plaintiff's case.

Dr. William George
Dr. William George was accepted as an expert in the area of pharmacology and toxicology. He is not a physician, but *379 earned a doctorate degree in pharmacology with a specialization is toxicology. He reviewed laboratory reports of tests performed on plaintiff on several occasions after his employment with Diamond ended, and said that the levels of heavy metals in plaintiff's system were always within normal limits. His opinion, based on his research of toxicology literature, is that there is no evidence that SIBM is caused by metals.
In Domonter v. C.F. Bean Corporation, 99-1204, pp. 11-12 (La.App. 5 Cir. 4/25/00), 761 So.2d 629, 637, the standard of review for Jones Act claims of negligence and unseaworthiness was summarized as follows:
The appropriate standard of review in a Jones Act and unseaworthiness claim is the manifest error or the clearly wrong standard. Foster v. Destin Trading Corp., on rehearing, 96-0803 (La.5/30/97), 700 So.2d 199, 202. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Brown v. Seimers, 98-694 (La. App. 5th Cir.1/13/99), 726 So.2d 1018, 1021, writ denied, 99-0430 (La.4/1/99), 742 So.2d 556; Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. Brown v. Seimers, 726 So.2d at 1021; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Brown v. Seimers, 726 So.2d at 1021; Stobart v. State, Through DOTD, 617 So.2d at 882. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error, even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d at 844-45.
The jury found Diamond negligent under the Jones Act, and further found that this negligence was a cause in the development of plaintiff's condition. An employer's negligence may arise in many ways, including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. Foster v. Destin Trading Corporation, 96-0803 (La.5/30/97), 700 So.2d 199, 208. Evidence of Diamond's negligence included testimony that Diamond employees improperly dumped oil-based muds into Lake Maracaibo and used polluted lake water in the water system used for drinking water. Plaintiff testified that his job duties included working with drilling muds in a room that reached temperatures as high as 160 degrees. The defense presented testimony to controvert this evidence, but the jury apparently believed the testimony showing that Diamond was negligent. While there are certainly two permissible views of the evidence in this case, the jury made credibility determinations and chose to believe the evidence supporting plaintiff's claim that Diamond was negligent under the Jones Act. Based on the evidence presented, we find no manifest error in the jury's conclusion on that issue.
On the issue of causation, a seaman need only present "slight evidence" that his employer's negligence caused his injuries. George v. Delta Queen Steamboat *380 Co., XXXX-XXXX, p. 11 (La.App. 4 Cir. 9/10/03), 854 So.2d 476, 482. Even under the "slight evidence" standard, this case is a close call.
As stated above, after a Daubert challenge, the trial court ruled that Dr. Carter could not testify as to the causes of SIBM, but could only testify as to his treatment of plaintiff. Defense counsel made a general objection at the beginning of Dr. Carter's testimony to his testifying as to SIBM. Despite being instructed by the trial court as to the limitations on his testimony, Dr. Carter stated that environmental, chemical and heavy metal contamination that plaintiff was exposed to in Venezuela while working for Diamond is the most likely cause of all of his illnesses. This statement was clearly beyond the scope of Dr. Carter's qualifications to testify as determined by the trial court, and the trial court should have instructed the jury to disregard this statement. The trial court erred in failing to do so. However, this error was harmless in that Dr. Carter's testimony as to causation was cumulative to the testimony of Dr. Jaffe.
Dr. Jaffe testified that his opinion is that plaintiff's exposure to toxic chemicals, combined with heat shock, while working on the Ocean Spartan was a sufficient predisposing cause of his illnesses, including his SIBM. He admitted that his conclusion is a hypothesis that has not been confirmed. However, in Davis v. ODECO, 18 F.3d 1237 (5th Cir.1994), evidence of medical causation included an inconclusive hypothesis that exposure to hydrocarbons while working aboard the defendant's vessels caused plaintiff to contract a rare disease called Goodpasture's Syndrome, or GPS. The Court held that even though the evidence as to causation was tenuous, "there was not a complete absence of probative factual evidence on the issue of medical causationas there must be to overturn a jury verdict under the Jones Act." Id. at 1242. The Court further stated that the plaintiff was entitled to recovery under the Jones Act if he adduced probative evidence that the defendant's negligence played any part, however small, in the development of his condition. Id. at 1242-1243.
We find that plaintiff carried his burden of proving medical causation through the testimony of Dr. Jaffe. Although the evidence presented by plaintiff to establish medical causation is underwhelming, it is sufficient to support the jury's verdict under the "slight evidence" standard applicable to the causation prong of a liability determination in a Jones Act case.
In its next assignment of error, Diamond argues that the trial court committed error by improperly instructing the jury. One of the instructions to the jury included the following sentence: "Mr. Lewis alleges that his condition was caused by his exposure to toxic chemicals and heavy metals and the working conditions aboard the Ocean Spartan in Lake Maracaibo, Venezuela." The jurors sent a written note to the trial court stating, "We are having an issue with Mr. Lewis' `condition' and what that includes. Explain condition with the Jones Act negligence. Does it include all illnesses or just SIBM?" Both plaintiff's counsel and defense counsel agreed to substitute the word "illness" for the word "condition." The court told the jurors that only they could determine what illnesses may or may not have been caused by the conditions aboard the Ocean Spartan.
Diamond argues that plaintiff was diagnosed with three separate conditions: (1) SIBM, (2) gastrointestinal distress (diarrhea) and (3) hypertension. Diamond claims that the court erred in its clarified instruction by suggesting to the jury that proof of causation of any illness entitled *381 the plaintiff to recovery for all illnesses, including SIBM, for which Diamond claims there is no evidence of causation. Diamond's issue with the trial court's clarification to the jury seems to be that the court used the word "illnesses" instead of "illness." However, counsel for Diamond did not object at the time the court gave this clarification to the jury. Defense counsel's objection was made after the clarification and outside the presence of the jury. The objection was not timely. We find no merit in this argument.
Diamond next argues that the trial court erred in failing to grant a mistrial on three separate occasions and committed numerous errors in its evidentiary rulings, which resulted in substantial prejudice to Diamond. Diamond refers to several instances in which plaintiff's counsel made several allegedly inflammatory remarks about Diamond. Diamond also refers to instances in which it claims the trial court allowed plaintiff's counsel to improperly state the law to the jury. It also points out instances where plaintiff's counsel attempted to elicit testimony on issues that the court had ruled inadmissible.
Our review of the record reveals no error on the part of the trial court in denying Diamond's requests for mistrial. Furthermore, we find no basis for overturning the trial court's evidentiary rulings cited by Diamond. This assignment of error has no merit.
Before we address Diamond's assignment of error regarding the award of general damages, we will consider Diamond's arguments relating to the award of maintenance and cure to plaintiff. Diamond argues that the trial court erred in failing to submit a jury interrogatory asking the jury to determine the date when plaintiff reached maximum medical improvement. Included in the jury instructions is the following statement by the trial court:
The maintenance and cure duty terminates only when maximum cure has been reached. Maximum cure is the point where it is probable that further treatment will result in no betterment of the seaman's condition. Namely, any future treatment is for the purpose of reducing pain or maintaining him in the same condition.
As this instruction correctly states the law as to the issue of maximum medical improvement, the trial court did not err in failing to also include a jury interrogatory on the issue of the date of maximum medical improvement.
Diamond also argues that the trial court erred in failing to conform the judgment to reflect that under general maritime law, no maintenance or cure is owed once a disease/condition is determined to be incurable. The jury verdict included an award of $27,116.00 for maintenance and $1,710,830.60 for cure. The law as to the right to maintenance and cure was set forth in Dejean v. St. Charles Gaming Co., Inc., XXXX-XXXX, p. 3 (La.App. 3 Cir. 5/4/05), 903 So.2d 521, 523-524, as follows:
"[T]he right to maintenance and cure must be construed liberally...." Barnes v. Andover Co., L.P., 900 F.2d 630, 633 (3rd Cir.1990). "Cure" involves the payment of therapeutic, medical, and hospital expenses, that are not otherwise furnished to the seaman, until the point of maximum cure. Pelotto v. L & N Towing Co., 604 F.2d 396 (5th Cir.1979); Taylor v. Mutual of Omaha Ins. Co., 520 So.2d 1122 (La.App. 3 Cir.1987). "When maintenance and cure terminates is a question of fact to be determined on the evidence presented." Thurman v. Patton-Tully Transp. Co., 619 So.2d 879, 881 (La.App. 3 Cir.1993). The duty of the shipowner to furnish medical care *382 continues until the sick or injured person has been cured or until the sickness or incapacity has been declared to be permanent. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). Maintenance and cure extends during the period when a seaman is incapacitated and continues until he reaches maximum medical recovery. Breese v. AWI, Inc., 823 F.2d 100 (5th Cir.1987). It is the medical, not the judicial, determination of permanency that results in the termination of the right to maintenance and cure. Id. "[M]aximum cure is achieved when it appears probable that further treatment will result in no [b]etterment of the seaman's condition." Pelotto, 604 F.2d 396, 400. "Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." Id.

Although the medical experts testifying at trial agreed that there is no known cure for SIBM, Drs. Carter, Harch and Jaffe testified that certain therapies undergone by plaintiff have improved and will continue to improve his condition. Diamond presented the testimony of several medical experts who disagreed with the opinions of the plaintiffs' experts on this issue, but the jury apparently chose to believe the testimony that plaintiff's condition has and will continue to improve with chelation and/or hyperbaric oxygen therapy treatments. By awarding maintenance and cure benefits to plaintiff, the jury established through its verdict that it does not believe that plaintiff has reached maximum medical improvement. While there are certainly two permissible views of the evidence on this issue, we cannot say the jury was manifestly erroneous in choosing the evidence in support of an award of maintenance and cure benefits to plaintiff. This assignment of error is without merit.
Diamond also argues that the trial court judgment reflects a duplication of damages in favor of plaintiff. Specifically, Diamond objects to the fact that plaintiff was awarded maintenance and cure, in addition to a general damages award that included amounts that are the equivalent of maintenance and cure. Maintenance is a form of compensation that arises out of the employment contract and is a daily stipend for living expenses, or an amount covering expenses for the cost of food and lodging that is equivalent to the food and lodging that he would have received on the vessel. Domonter v. C.F. Bean Corporation, 99-1204, p. 18 (La.App. 5 Cir. 4/25/00), 761 So.2d 629, 640. Cure is payment of the seaman's medical, therapeutic and hospital expenses, until that point in time when plaintiff reaches maximum medical recovery. Id.
While we find no error in the trial court's maintenance and cure awards, we do find that part of the general damages award is duplicative of the award for cure. The jury interrogatory form shows that the damages award of $5,409,655.00 represents future medical care, past income loss, future wages and found and impairment of earning capacity or ability in the future, including impairment in the normal progress in plaintiff's earning capacity due to his physical condition, physical pain and suffering including physical disability, impairment, inconvenience, and the effect of plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life, past mental anguish and feeling of economic insecurity caused by plaintiff's disability, future mental anguish and feelings of economic insecurity caused by plaintiff's disability.
*383 An award for cure represents past and future medical care. The record shows that plaintiff's medical expenses as of the time of trial were $451,066.42. We conclude that of the $1,710,830.60 awarded for cure, $451,066.42 represents past medical expenses and $1,259,764.18 represents future medical expenses. Included in the general damages award is the item of future medical care. Thus, the general damages award of $5,409,655.00 must be reduced by $1,259,764.18 as this latter amount is duplicative of the award for cure. Accordingly, the general damages award will be amended to the amount of $4,149,890.82. We are not disturbing the amounts awarded to plaintiff for maintenance and cure, $27,116.00 and 1,710,830.62 respectively.
In another assignment of error, Diamond argues that the trial court erred in awarding excessive general and future medical damages that were not supported by the evidence. Specifically, Diamond argues that the evidence only established a possible causal link to gastrointestinal illness. As stated above, plaintiff carried his burden of proving causation as to all of his illnesses, including SIBM.
Diamond also alleges that plaintiff has offered no evidence of physical pain and suffering as a result of his SIBM. Diamond argues that plaintiff is not entitled to an award for pain and suffering because it alleges that the record contains no evidence that plaintiff suffered any physical pain or required any pain medication for his SIBM. According to Diamond's calculations, the jury awarded plaintiff $3,142,290.80 for pain and suffering. Diamond arrived at this figure by subtracting from the total damages award the amounts awarded for future medical expenses and past and future lost wages. Other than the award for future medical expenses, which we have found to be duplicative to the cure award, and the award for past and future wages, the general damages award includes physical pain and suffering including physical disability, impairment, inconvenience, and the effect of plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life, past mental anguish and feeling of economic insecurity caused by plaintiff's disability, future mental anguish and feelings of economic insecurity caused by plaintiff's disability.
In Duncan v. Kansas City Southern Railway Co., XXXX-XXXX, p. 13 (La.10/30/00), 773 So.2d 670, 682, the Louisiana Supreme Court stated:
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Keeth v. Dept. of Pub. Safety & Transp., 618 So.2d 1154, 1160 (La.App. 2 Cir.1993). Vast discretion is accorded the trier of fact in fixing general damage awards. La. Civ.Code art. 2324.1; Hollenbeck v. Oceaneering Int., Inc., 96-0377, p. 13 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 172. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
With the exception of the portion of the general damages award representing future medical care, or $1,259,764.18, we find *384 no abuse of the trier of fact's vast discretion in the balance of the general damages award. This assignment of error is without merit.
Diamond also argues that the award of future medical expenses is not proportionate with plaintiff's life expectancy as predicted by Dr. John Olsen. As stated above, we are amending the general damages award to subtract the amount for future medical care already included the cure award. However, we will address the correctness of the amount awarded for future medical care in the cure award.
A reading of Dr. Olsen's testimony shows that he stated that people with Lou Gehrig's disease, which he analogized to SIBM, die about 6 to 18 months after the disease affects swallowing, and his assumption is that the same would be true for SIBM patients such as plaintiff who have developed swallowing problems. Dr. Olsen did not offer an estimate as to plaintiff's life expectancy other than to say his prognosis is not good unless his condition is treated. Dr. Larry Stokes, an expert in vocational rehabilitation counseling and life-care planning, testified as to the range of plaintiff's estimated future medical expenses and said these expenses could be as high as $180,607.00 annually. Dr. Randolph Rice, an expert economist, reviewed the figures suggested by Dr. Stokes, and testified as to his opinion of plaintiff's future health care costs based on his estimation that plaintiff's life expectancy from the time of trial could be as much as 23.59 years. Based on the evidence presented on this issue, we cannot say the trial court abused its discretion in the award for future medical care included in the cure award.
In its next assignment of error, Diamond argues that the award for cure should be reduced because some of plaintiff's medical expenses were paid for by other sources including Medicare/Medicaid and plaintiff's wife's health insurance carrier. We do not find that Diamond has produced sufficient evidence to support its claim that it is entitled to credit for payments of medical expenses from collateral sources. This assignment of error is without merit.
Diamond argues that plaintiff is not entitled to pre-judgment interest. On the issue of interest, the trial court judgment stated that interest was awarded "at the legal rate, in accordance with law, and all costs of these proceedings." Post-trial, plaintiff filed a Motion to Set Pre-Judgment Interest, which was denied by the trial court. Thus, the trial court determined that plaintiff is not being awarded pre-judgment interest, and we find no abuse of the court's discretion in so ruling. This assignment of error is without merit.
In its next argument, Diamond argues that it has been prejudiced by an incomplete trial transcript. Specifically, Diamond argues that its objections to jury instructions, and the court's rulings on the same, were not transcribed by the court reporter. Counsel for Diamond cites a conversation between him and the court reporter, in which she allegedly told him that she had destroyed her notes and recordings once she prepared the transcript. Diamond contends that this was a violation of Uniform District Court Rule 4.0 and La. C.C.P. article 372, which requires a court reporter to retain her notes and recordings for at least two years after transcription is completed. We cannot verify from the record before us the allegations that Diamond has made regarding the court reporter. However, we note that the record includes some objections to jury instructions by Diamond and the court's rulings on the same. Assuming arguendo that the transcript omits other objections by Diamond, we find that any error was *385 harmless because the instructions given to the jury fairly and accurately set forth the legal principles applicable in this case. This assignment of error has not merit.
As stated above, the appeal of the judgment on the merits was consolidated with the appeal of the judgment taxing costs for expert witnesses against Diamond. In its October 5, 2007 judgment, the trial court taxed costs against Diamond for the following expert fees: $7,500.00 as to Dr. Carter, an additional $8,000.00 as to Dr. Jaffe, $824.00 as to Dr. England, $1,059.00 as to Dr. Engel, $1,375.00 as to Mr. Petty, $1,619.50 as to Dr. Rice and $1,500.00 as to Dr. Olsen. On appeal, Diamond argues that the trial court erred in awarding excessive and unreasonable amounts to plaintiff's experts, Drs. Jaffe and Carter. The trial court has the discretion to tax as costs expert fees for preparatory, non-testifying expenses, in addition to costs for time spent testifying at trial. Vela v. Plaquemines Parish Government, 2000-2221 to 2000-2224, p. 30 (La.App. 4 Cir. 3/13/02), 811 So.2d 1263, 1282-1283. Based on the evidence presented on the issue of expert witness costs, we cannot say the award of expert costs was excessive or unreasonable. We find that the trial court did not abuse its discretion in its award of costs.
For the reasons stated above, we reduce the total amount of the trial court judgment in case number 2007-CA-0497 from $7,147,601.60 to $5,887,837.42. In all other respects, we affirm the judgment in case number 2007-CA-0497. We also affirm the trial court judgment in case number 2007-CA-1566.
AMENDED, AND AS AMENDED, AFFIRMED.

ON APPLICATION FOR REHEARING
MICHAEL E. KIRBY, Judge.
We grant the rehearing application of defendant, Diamond Offshore Drilling, Inc., for the sole purpose of correcting a misstatement made in our original opinion in the discussion of an allegedly improper jury instruction. During deliberations, the jurors sent a note asking the trial court to explain what was included in the term "condition" in the sentence in one of the jury instructions, which stated, "Mr. Lewis alleges that his condition was caused by his exposure to toxic chemicals and heavy metals and the working conditions aboard the Ocean Spartan in Lake Maracaibo, Venezuela." Plaintiff's counsel and defense counsel agreed to substitute the word "illness" for the word "condition." The jurors were brought back into the courtroom, and were told by the trial court that only they could determine what illnesses may or may not have been caused by the conditions aboard the Ocean Spartan.
Immediately after the jurors left the courtroom to resume deliberations, defense counsel objected to the trial court's clarified instruction, arguing that the statement suggested to the jury that proof of causation of any illness entitled the plaintiff to recovery for all illnesses, including SIBM, for which Diamond claims there is no evidence of causation. In our original opinion, we found that the defendant's objection was untimely because it was raised outside the presence of the jury.
On rehearing, defendant argues that the objection was timely because it was made immediately after the jury left the courtroom. The defense cites La. C.C.P. article 1793(C), which states:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter *386 to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
Because the record confirms that the objection was made immediately after the jurors left the courtroom to resume deliberations, the statement in our original opinion that defendant's objection to the clarified jury instruction was untimely was incorrect.
Although the objection was timely, we nonetheless find the defendant's assignment of error on the issue of the jury instruction to be without merit. We conclude that the statement at issue made by the trial court to the jury does not constitute reversible error.
This rehearing application is granted only for the purpose of correcting the misstatement regarding the timeliness of the defendant's objection. In all other respects, the rehearing application is denied. We affirm the judgment rendered in our original opinion.
REHEARING APPLICATION GRANTED IN PART; DENIED IN PART; JUDGMENT AFFIRMED.
NOTES
[1] Diamond also alleged as error the trial court's failure to exclude the testimony of Dr. Paul Harch and Dr. John Olsen, but did not brief the objection to the testimony of these two witnesses. Therefore, Diamond's arguments as to the failure to exclude the testimony of Drs. Harch and Olsen are abandoned. See Uniform RulesCourts of Appeal, Rule 2-12.4; Folse v. Gulf Tran, Inc., XXXX-XXXX (La. App. 1 Cir. 2/23/04), 873 So.2d 718.