CLARENCE E. McMANUS, Judge.
| j>This suit arises from an expropriation proceeding filed by the State of Louisiana, Department of Transportation and Development (hereinafter “DOTD”), pursuant to Louisiana Revised Statutes Title 48, known as the “Quick Taking Statutes” and involving the taking of certain tracts of *157 land for the construction of the 1-810 junction. DOTD appeals from the judgment in favor of the landowners, which awarded additional compensation for the value of the property taken, severance damages to the remainder of the property, legal interest from the date of the taking, costs and attorney fees. The landowners answered the appeal, seeking an increase in attorney fees and costs. For the reasons that follow, we affirm the decisions of the trial court and remand the matter for further proceedings relative to the issue of attorney fees for appeal.
PROCEDURAL HISTORY
On May 4, 1987, DOTD filed a petition for expropriation pursuant to LSA-R.S. 48:441-460, taking ownership of certain tracts of property owned by landowners for the construction of the junction known as 1-310. DOTD deposited into the registry of the court $46,558.00.
| ¡¡The landowners filed a reconventional demand alleging that the amount deposited into the registry of the court was not just compensation for the value of the land taken. They further alleged that the construction project damaged the remaining property. The landowners sought an increase in the amount of compensation, severance damages for the remaining property, legal interest and attorney fees.
The matter was first tried by a jury in March of 2006 who awarded additional compensation of $45,114.00. The jury did not award severance damages for the remainder of the property. After the denial of their motion for judgment notwithstanding the verdict and/or new trial, the landowners appealed. On February 6, 2008, this Court granted a new trial based on jury misconduct. DOTD v. Monteleone, et al, 07-459 (La.App. 5 Cir. 2/6/08), 976 So.2d 798, writ denied, 08-723 (La.6/6/08), 983 So.2d 918.
A nine day judge trial was held in March of 2010. At its conclusion, the trial judge rendered a verdict in favor of the landowners. The court found that the value of the land appropriated was $214,534.14 and therefore the landowners were entitled to an additional $167,976.14 (after subtracting the portion DOTD had deposited in the registry of the court). The court further awarded severance damages to the rest of the property in the amount of $1,416,466.40. The trial court awarded interest from the date of the landowner’s answer, and reserved the issues of attorney’s fees and expert witness fees. Pursuant to a grant of a partial new trial, the court adjusted the legal interest award to commence on the date of taking, pursuant to LA-R.S. 48:455, effective January 1, 1975.[1] The court also assessed costs of $173,000.00 and attorney fees of $900,000.00 against DOTD.
| /This appeal followed.
DISCUSSION
Louisiana Constitution Article I, § 4(B) provides, in pertinent part:
(1) Property shall not be taken or damaged by the state ... except for public purposes and with just compensation paid to the owner or into court for his benefit....
(5) In every expropriation ..., a party has the right to trial by jury to determine whether the compensation is just, and the owner shall be compensated to the full extent of his loss.
*158 Additionally, La. R.S. 48:453 provides, in pertinent part:
A. The measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court, without considering any change in value caused by the proposed improvement for which the property is taken.
B. The measure of damages, if any, to the defendant’s remaining property is determined on a basis of immediately before and immediately after the taking, taking into consideration the effects of the completion of the project in the manner proposed or planned.
C. The owner shall be compensated to the full extent of his loss.
A landowner whose property is expropriated by the state is to be compensated so that he remains in an equivalent financial position to that which he enjoyed before
the taking. State, Dept. of Transp. & Development v. Dietrich, 555 So.2d 1355, 1358 (La.1990). Where the landowner challenges the amount DOTD deposits as just compensation for an expropriation, a greater value must be proven by a preponderance of the evidence. State, Dept. of Transp. & Development v. Estate of Bickham, 93-1664, p. 3 (La.App. 1 Cir. 6/24/94), 640 So.2d 841, 842. Speculation, conjecture, mere possibility and even unsupported probability are not sufficient to support a judgment. State, Dept. of Transp. & Development v. Manuel, 93-269, p. 3 (La.App. 3 Cir. 2/9/94), 640 So.2d 299, 301, writ denied, 94-0542 (La.4/29/94), 641 So.2d 203.
|sThe question of what damages will appropriately compensate the landowner is one of fact. BicJcham, supra. This determination is necessarily dependent on evidence presented by expert witnesses; however, the factfinder is not obligated to accept an expert’s opinion in expropriation cases, since those opinions are not binding and are merely advisory in nature. Id. The trial court may give whatever weight it considers appropriate to the testimony of any and all witnesses in making its factual determination of the value of the property taken, and may reach a conclusion that does not coincide with the testimony of any witness. State, Department of Transp. and Development v. Restructure Partners, L.L.C., 07-1745 (La.App. 1 Cir. 3/26/08), 985 So.2d 212, writ denied, 08-1269 (La.9/19/08), 992 So.2d 937.
In an expropriation proceeding, a factfinder’s factual determinations as to the value of property and entitlement to other types of damages are subject to the manifest error standard of review, while the amount of damages awarded is subject to the abuse of discretion standard of review. See City of Baton Rouge v. Johnca Properties, L.L.C., 03-0632, p. 8 (La.App. 1 Cir. 2/23/04), 873 So.2d 693, 699, writ denied, 04-0696 (La.5/7/04), 872 So.2d 1083.
Under the “highest and best use” doctrine, the landowner is entitled to compensation based on the potential use of the property, even though the property is not being so utilized at the time of the taking, if the landowner can show that it is reasonably probable that the property could be used for that purpose in the not too distant future, absent the expropriation and the project for which the property was expropriated, and provided such use would have an effect on the price the buyer is willing to pay. West Jefferson Levee District v. Coast Quality Construction Corp., 93-1718 (La.5/23/94), 640 So.2d 1258, 1273, cert. denied, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995); State v. St. Charles Airline Lands, Inc., 03-1292 (La.App. 5 *159 Cir. 4/27/04), 871 So.2d 674, writ denied, 04-1552 (La.10/1/04), 883 So.2d 992.
Severance damages may be awarded in expropriation cases when appropriate or properly proven. The term “severance damages” describes those com-pensable damages that flow from the partial expropriation of a tract of land, i.e., the difference between the value of the remaining property before and after the taking. Bickham, supra, 93-1664 at pp. 7-8, 640 So.2d at 845. See also La. R.S. 48:453(B).
The landowner has the burden of proving severance damages with legal certainty by a preponderance of the evidence. The informed and reasoned opinion of an expert, corroborated by facts in the record, may sufficiently prove a severance damage loss, particularly where it is accepted by the trier of fact. The most commonly accepted and used approach for determining the amount of severance damages is the “before and after” method of appraisal. However, under certain exceptional circumstances the “before and after test” will not adequately compensate the owner for his damage and the courts will resort to the “cost-to-cure” method of computation, not for the purpose of restoration, but to gauge the diminution in market value as would be reflected in a lower purchase price that a well-informed buyer would be willing to pay. Restructure Partners, L.L.C., supra.
The landowners, known as the St. Charles Syndicate,[2] had ownership of a tract of land of approximately 14,034.948 acres, located in the LaBranche Wetlands, in St. Charles Parish, Louisiana. The land in question lies in St. Charles Parish and runs from north of Airline Highway and, for the most part, north of the |7Hurricane Protection Levee footprint as designated in 1987 to Lake Pontchartrain. It runs in part from the Jefferson Parish line westward. At the time of the taking it was traversed by the Illinois Central Railroad and U.S. Interstate 1-10. It is today traversed on its more eastern end by the I-10/T-310 exchange and by 1-310 running roughly north to south. On the western side of 1-310 the land does not at any point traverse Airline Highway.
The property taken is subject to the wetlands permitting jurisdiction of the Corp of Engineers and the Louisiana Department of Natural Resources. At the time of the taking, the property consisted of cypress forest, marshland and open water. Two years prior to the taking, a Marsh Management Plan had been put in place by the landowners to restore and preserve the property. The Marsh Management Plan was administered by the landowners’ agent, Allan Ensminger. In addition, the property was subject to a special use assessment for tax purposes.
The landowners presented the testimony of Bennet Oubre concerning the value of the land taken, and the value of severance damages to the remainder. Oubre was qualified without objection as an expert in real estate appraisal and expropriation. Oubre testified that just compensation is the amount of money necessary to return the landowner to the same position as prior to the taking. In the case of a *160 partial taking, just compensation is calculated by subtracting the value of the land taken from the value of the entire parcel before the taking and then determining the market value of the property as if the project had already been built. The difference between these two values constitutes severance damages. Oubre further stated that he considers the land value based on the highest and best use, even if the landowner is not using the property for those purposes at the time of the taking.
| sOubre testified that he was hired in 2004, and that he did a retrospective appraisal, which would take into account only the information that was available in 1987, and not information learned subsequent to the taking. He considered the highest and best use to be that use which would be legally permissible, physically possible, financially feasible, and would generate maximum return. At the time of the taking, physical features influencing property use were the location of 1-10, the existence of the railroad which runs roughly along the 1-10 path on the south side of 1-10, and the planned location of the not-yet-built levee system, which as proposed in 1987 ran roughly along the Airline Highway path just to the north of Airline Highway (which plan was later shifted to the north). Oubre considered the location of the levee significant because it was assumed that land within the levee protection would be developed. Oubre considered the fact that the railroad and 1-10 affected access to the property to the north of these encroachments. Oubre considered that at the time of the taking the portion of the property located south of the 1-10 and the railroad had indirect access to Airline Highway through dedicated but unconstructed streets which ran through the property perpendicular to Almedia Road and that Almedia Road exited onto Airline Highway, (hereinafter described as “right of access”). Oubre also considered that the property was classified as wetlands.
In determining its value, Oubre subdivided the land into three parcels.
PARCEL ONE
Parcel One consists of 16 acres south of and between the proposed levee location (as it existed at the time of taking), and Airline Highway. Parcel One was wetland within the proposed levee protection area, and had right of access at several points. On comparable properties, there was speculative activity, as well as a number of subdivisions and two landfills. Oubre concluded that the highest and |9best use of Parcel One was future industrial and commercial development. Oubre subdivided Parcel One into East and West. Parcel One East, east of 1-810, consisted of 12.67 acres; the part taken was 8.07 acres. He valued the property before the taking at $16,552.00 per acre so that the market value of the part taken was $133,574.64. He calculated no severance damage to the remainder of Parcel One East, because sufficient access points remained to justify speculative development.
Parcel One West was still within the levee protection; however Oubre concluded that the access points to the property were lost as a result of the taking. The remainder of Parcel One West consisted of 1.95 acres with an after taking value of $300.00 per acre. Thus the value of land remaining in Parcel One West after the taking was $585.00, and the landowners were entitled to $31,691.00 in severance damages, reflecting the decrease in value of the 1.95 acres from $16,552.00 per acre to $300.00 per acre.
PARCEL TWO
Parcel Two consisted of 8,000 acres north of the levee and south of the railroad tracks. While Parcel Two was outside of levee protection, it was still close to a *161 major metropolitan area and had several access points.[3] Oubre concluded that the highest and best use of Parcel Two was speculative future development with interim use of mineral development and recreational wetlands.
Oubre valued the land in Parcel Two at $800.00 per acre. He distinguished Parcel Two land from Parcel Three land (discussed infra) because there was some speculation of possible use of Parcel Two land at the time of the taking, unlike the remote wetlands of Parcel Three. Oubre testified that 54.64 acres of Parcel Two | inIand was taken, yielding a market value of $43,712.00. The indicated value of the remaining land was $6,472,120.00.
Oubre further subdivided Parcel Two into East of 1-310 and West of 1-310 for the purposes of determining severance damages. Parcel Two East’s highest and best use remained speculative future development with interim use of mineral development and recreational wetlands, and its value did not change with the addition of the 1-310 overpass. Oubre testified, based upon the testimony of the experts, that there was a diminishment of the quality of the wetlands due to saltwater intrusion, and therefore the property was worth $650.00 per acre after the taking, with a market value of $372,047.00, as a result of the salinization-caused damage to Parcel Two East.
Considering Parcel Two West, Oubre testified that the existing access points were no longer under the landowners’ control after the taking. The right of access would have had to run under 1-310 through the land the state held in fee simple. [There was no evidence that there a street could run under 1-310 even if both the federal government and the state granted permits.] Thus, the highest and best use was now mineral development and recreational wetlands, with speculative future development no longer a reasonable expectation. In addition, the quality of the wetlands was diminished by the intrusion of saltwater. Oubre determined that the value of Parcel Two West after the taking was $150.00 per acre. Accordingly, he valued just compensation to the landowners at $43,712.00 for the part taken and $4,972,219.00 in severance damages for the entirety of Parcel Two. Oubre also assessed as additional damages $586,000.00 to repair/replace weirs to cure the saltwater intrusion and halt the deterioration of the marshland.[4]
J^PARCEL THREE
Parcel Three consisted of 5,887 acres of wetlands, running between 1-10, the Illinois Central Railroad and Lake Pontchartrain, with access by boat or driving on the railroad tracks. Implied in Oubre’s testimony is that the highest and best use of Parcel Three was recreational wetlands, and use for hunting and fishing. Oubre valued Parcel Three at $500.00 per acre. Oubre testified that 90.09 acres were taken by the state, with an actual value of $45,045.00.[5] The value of the landowners’ *162 remaining property, prior to the taking, was $2,893,700.00. Oubre assessed the remaining property with the same access after the taking. In Oubre’s opinion, the property still has the same highest and best use-mineral production and recreational wetlands. Thus, Oubre found no severance damages owed for the remainder of Parcel Three.
In summary, Oubre calculated the total of just compensation due to the landowners at $222,382.00 for the land taken and $5,589,910.00 in severance damages and costs to remediate.
DOTD presented the testimony of Jack Evans as to the value of the land taken. He was accepted as an expert in real estate appraisal. Mr. Evans had performed extensive work for the State appraising properties, including every piece of property DOTD acquired for the construction of 1-310. In this case, the entirety of the landowners’ property consisted of almost 14,035 acres. Three parcels of land were taken in four acquisitions by DOTD. In Mr. Evans’ opinion, the highest | t2and best use of all of the landowners’ property was recreational wetlands or preservation as a wildlife estuary, with a value of $300.00 per acre. In determining the highest and best use, he considered legal implications and legal impediments, and physical characteristics of the property. There were three legal impediments associated with the property. 1) It had been zoned W-l wetlands and therefore development would require obtaining permits under Section 404 of the Clear Water Act as well as the Department of Natural Resources Coastal Zone Management. 2) Permits had been issued to the landowners to implement a Marsh Management Plan which limited use that could be made of the property prior to the taking. 3) Lack of access to the property also affected its highest and best use. Evans further stated that he found that severance damages were not warranted, as the property remaining to the landowners had the same highest and best use, and therefore the same value per acre, both before and after the taking. Evans did not address the issue of salinization.
By agreement of the parties, DOTD also introduced the 2006 trial testimony of Rebecca Deano, qualified as an expert in the field of real estate appraisal. She agreed with Jack Evans that the highest and best use of the property was for recreational purposes, and that the value of the property at the time of the taking was $300.00 per acre.
CONSTRUCTION OF 1-310 — SALTWATER INTRUSION.
In evaluating the property, DOTD’s expert, Evans, did not include any amounts for severance damages. The landowners’ experts testified regarding the deleterious effects of the construction of 1-310 and concluded that the project construction caused increased intrusion of saltwater into the marshland which raised the salinity levels and further damaged the already compromised marshland beyond the damage which would have occurred without the construction of 1-310.
| ijjOn behalf of the landowners, Allan Ensminger, who was qualified as an expert in wetlands, restoration, biology and wetlands management, testified that he had been intensively involved in the management of the landowners’ property, and was also responsible for the maintenance of the landowners’ business records. He testified that saltwater intrusion from Lake Pontchartrain increased after the construction of the Mississippi River Gulf Outlet (MRGO) saltwater channel in Eastern New Orleans. He opined that 1-310 construction would cause saltwater from the channel to reach the landowners’ property because of the increased access caused by *163 the necessity of bringing barges and equipment to the construction site via canals running from Lake Pontchartrain.
Ensminger further testified that because of the construction of I — 10 through the property (I — 10 forms the boundary between Parcel Two and Parcel Three), saltwater had begun to intrude into the marshland. Ensminger explained that because DOTD was aware that the 1-310 construction project would have an even greater environmental impact upon the marshland, it built three water structures, or weirs, to control the salinity flow and to protect the large freshwater swamp from the construction-caused saltwater intrusion from Lake Pontchartrain. These weirs were constructed with gates that were to be closed when the salinity exceeded acceptable levels. However, the weirs immediately malfunctioned and from the time of installation were unsuccessful in protecting the marsh from the construction-caused salt water intrusion. According to En-sminger, DOTD did nothing to correct the situation.
Diming his testimony, Ensminger referred to the Marsh Management Plan that had been implemented by the landowners to try to protect the property. According to Ensminger, when the plans for mitigation were developed, the landowners agreed with the selection site for the weirs, and also planned to build [14some additional structures. The plan was designed for the landowners to manage the weirs, and to close the gates when the salinity levels exceeded acceptable limits. However, the landowners did not operate the weirs, nor did they take any action to correct the issues with the weirs.
Ensminger also stated that, while the property was not actually taken until 1987, DOTD actually began clearing the right-of-way for 1-310 as early as 1981.
Patricia Joy Young qualified as an expert in dendroecology[6] with a specialization in cypress trees. She testified on behalf of the landowners. She stated that she had made several visits to the property between 2005 and 2009, and opined that in ten years most of the cypress trees would have died as a result of salinity in the marsh. The analysis of the trees on the landowners’ property near 1-310 showed saline stress starting in 1984 and continuing to the present time. In her opinion, the damage to the cypress trees on the landowners’ property was caused by salinity-
Ms. Young conducted her study by comparing the landowners’ property to a control site with the same elevation and physical characteristics, with the only difference being the level of salinity. She found that the control site had regeneration in the form of cypress seedlings. She did not see any seedlings on the landowners’ property. Ms. Young was asked whether a canal that had been dug in the mid-1980s and which could have brought salinity into the area would correlate with her findings that salinity killed the cypress trees. She responded that it was the only impact that she knew of that had occurred in that time period to account for her findings.
11RPr. George Castille was qualified as an expert in historical geography and cypress swamps. He inspected the property, making approximately 35 trips over the previous ten years. He took photographs, made observations on water levels and tree conditions, and measured salinity at a number of places on the property at various times. He also reviewed historical *164 documents. Dr. Castille found saltwater damage extending on the property to the hurricane protection levees occurring from 1984. He stated that the documents he reviewed indicated that DOTD was aware of the saltwater intrusion and the problems associated with it. Dr. Castille also presented visual evidence in the form of aerial photos taken in 1984 that showed that trees had been cleared for the 1-310 right-of-way.
DOTD presented the testimony of Dr. Denise Reed, who was qualified as an expert in geomorphology,[7] coastal processes, geology, and marsh management/restoration. She studied the Marsh Management Plan that was proposed and implemented for the property. The Plan was designed to manipulate water levels to encourage vegetative growth and enhance wildlife habitats on the subject property. The purpose of the plan was not to restore the land to the way it looked at some historical point, but to promote a good ecosystem, in this case waterfowl and plants. Ms. Reed also stated that normally plans like these were expected to last for 20 years. However, there was nothing in her testimony and nothing in the Marsh Management Plan to indicate a 20 year range for this particular project.
John Day was qualified as an expert in marine ecology, marine biology, coastal and wetlands ecology and limited hydrology.[8] He testified on behalf of the DOTD, and concluded that the construction of I-310 did not cause wetland degradation. First he found that the majority of the wetland loss had occurred | ^before 1-310 was constructed. He noted that area data showed the beginning of the breakup of wetlands in the 1960s, coinciding with a significant drought in 1963, Hurricane Betsy, and the opening of the MRGO. Second, the major loss of the wetlands after the construction of 1-310 coincided -with the drought of 2000, which would have lowered water levels and increased salinity. He also opined that the wetlands were affected by the river’s accretion and subsidence, and the damage that nutria would do in a marshland.
Dr. Richard Klein was qualified as an expert in forest wetland ecology, forest wetland hydrology and dendrochronology. He testified on behalf of DOTD, stating that he analyzed the cypress trees and found no pattern in the tree rings that would coincide with either the construction of 1-310 or the associated mitigation resulting from the malfunctioning weirs.
Dr. Gary Shaffer, qualified as a wetlands ecologist, testified that south and southeast winds push meteorological tides into the swamps that can cause infiltration of salt water for up to two weeks. These events happen roughly seven times a year.
Leonard Chauvin, a civil engineer, was questioned about the cost to repair or replace the three mitigation control structures, discounted back to 1982. He estimated the cost at $492,000.00.
After consideration of the above evidence, the trial court awarded compensation to the landowners for the value of the property taken in addition to the $46,558.00 deposited by DOTD into the registry of the court, as well as severance damages to the remainder of the property, interests, costs and attorney fees. In its judgment the trial court separated the award of damages as follows:
*165 The court agreed with the landowners’ expert on Parcel One and awarded $133,574.64 in just compensation for the 8.07 acres taken. With regard to Parcel | 17Two, the court found that the entire property did not enjoy the same value. The trial judge found that only that portion of the property nearest to Airline Highway was valued at $800.00 per acre and that the property decreased in value to $650.00 further north and then to $500.00 even further north near the railroad tracks. The court stated that as to Parcel Two, 18.21 acres in total were taken and it awarded $35,509.50 for the actual property taken. As to Parcel Three, the court adopted Oubre’s evaluation of $500.00 per acre and awarded $45,450.00 for the 90.9[9] acres taken. Combining these three, the trial court found that the value of the land actually appropriated was $214,534.14.
The court then considered the issue of damages to the remaining property.
With regard to Parcel One, the trial court found that no severance damages were due to Parcel One East. As to Parcel One West, the trial court adopted the opinion of the landowners’ expert with regard to the decrease of value in the remaining 1.95 acres of Parcel One West from $16,552.00 per acre to $300.00 per acre for a total loss of $31,691.40.
Concerning Parcel Two, the trial court found that severance damages were warranted. The court relied on the testimony of Mr. Oubre and concluded that Parcel Two’s highest and best use before the taking included a market speculative component, which was lost after the taking. The court found that the per-acre value of Parcel Two decreased from a range of $800.00 to $500.00 to a range of $650.00 to $300.00 after the taking. The court determined that 7,980.86 acres of the landowners’ remaining land suffered this diminution in value and awarded $1,330,145.00 in severance damages. In addition, the court found that 109.26 acres had been degraded by salt water intrusion caused by the construction work, exacerbating the salinization damage that had already occurred. The court found |18that this further decreased the value of those 109.26 acres in Parcel Two to $150.00 per acre and it awarded $54,630.00 for the physical damage to that property.
Considering Parcel Three, the court apparently agreed with Mr. Oubre and Mr. Evans that the highest and best use of the property both before and after the taking was recreational wetlands, and that the property remaining to the landowners had suffered no diminution in value as a result of DOTD’s taking, and therefore, it awarded no severance damages for Parcel Three.
Thus the trial court awarded $167,976.14 in additional compensation and $1,416,466.40 in severance damages.
In its judgment, the court did not award any amounts for damages allegedly attributed to the failure of the weirs or their restoration. The court found that the wetlands had suffered deterioration even before the construction of 1-310 and that the landowners did not prove that, even had the weirs operated properly, the wetlands would have been restored and would not have continued to suffer deterioration. The court further found that the landowners had no basis to reasonably rely on DOTD efforts to repair the already damaged wetlands, or ameliorate further deterioration from causes other than 1-310, through the construction of the weirs.
APPEAL OF DOTD
In its first and second allegations of error, DOTD complains of the trial *166 court findings that Parcels One and Two had access before the taking, thereby finding that the speculated best use for Parcels One and Two was to hold the property for future industrial and commercial development, and in relying on loss of access as a basis for awarding severance damages.[10]
I19DOTD contends that the alleged access to the property was through undedi-cated streets in paper subdivision plans, which access had been lost before the taking. It contends that the law at the time of the taking in 1987 provided that the dedication of unimproved streets not developed for ten years is revoked by operation of law. DOTD opines that since the dedications at issue were made in the 1960’s, they had been revoked and therefore, Parcels One and Two enjoyed no access pre-taking. DOTD further argues that, because the landowners’ appraiser erred in relying upon the non-existent access in his conclusions as to the property’s highest and best use and value, the trial court committed legal error in relying on these ill-conceived conclusions, which invalidates the trial court’s conclusions as to the value for all the property taken.
The landowners’ expert testified that, prior to the DOTD’s taking, the property enjoyed the potential for access in several places, which were lost when DOTD took the property in fee simple, thereby blocking the control of the property and the landowners’ access to Airline Highway. In State, Dept. of Transp. & Development v. Scramuzza, 96-1796 (La.4/8/97), 692 So.2d 1024, the Louisiana Supreme Court found error in this Court’s ruling[11] that dedication of streets was revoked by abandonment, stating instead that a formal act of revocation was necessary. Scramuzza did not create new law; it simply interpreted law already in existence. Therefore, DOTD’s premise that the dedication fell away by operation of law is ill-founded. There was a reasonable basis for the trial court to find that access existed pre-taking and was lost, thereby diminishing the value of the property for future speculative development.
|20As to the loss of access issue, DOTD secondarily argues that, should the dedicated but unimproved roadways remain dedicated, access to Parcel Two West continues through the continuation of the dedicated paper streets under the 1-310 overpass. In this regard, DOTD argues that since the landowners made no Parcel Two East severance damage claim based on loss of access, they must have concluded that such access continues and that if it does, DOTD did not take the paper streets in fee simple.
The land taken by DOTD bisected Parcel Two, and thus the access enjoyed by Parcel Two West was severed from Parcel Two East. DOTD argued that the landowners could pass under 1-310 to access Two West; however that contention was not supported by the evidence presented. Mr. Oubre testified that while a fisherman in a shallow boat might enjoy access under the interstate, the same could not be said *167 for commercial enterprises. There was no testimony that access by road is physically feasible under 1-310. Furthermore, the federal government, not the state, controls access under an interstate highway.
The trial court was reasonable in its finding that DOTD’s taking destroyed access to Parcel Two West, and that its disruption contributed to devaluation of that portion of the property after the taking.
In its third allegation of error, DOTD argues that the trial court erred in defining Parcel Two as “the larger parcel” and in finding that Parcel Two constituted a singular use tract for the determination of severance damages. DOTD argues in allegation of error four that the trial court erred in subdividing Parcel Two into three smaller portions for the purpose of calculating severance damages without specifying the dimensions of each sub-parcel. Because these allegations are related, we will consider them together.
|¡flAs to these assignments, DOTD first argues that the trial court erred in finding that the highest and best use for Parcel Two was mineral production and recreational use with a future speculative development.
At trial, Mr. Oubre testified that he considered several factors in concluding that Parcel Two had a speculative development component. Although the land was classified wetlands, it had multiple access points. It is “next to — annexed and within” the largest metropolitan area in the state. There was significant development occurring in St. Charles Parish, and the people buying within the wetland area prognosticated that eventually industrial or commercial development would take place. DOTD also asserted that the landowners’ Marsh Management Plan limited the land to a recreational highest and best use. Oubre opined however that he saw nothing conflicting in the landowners’ actions in working to preserve/restore the land at the present time, while still holding it for future development in the “foreseeable” future. Oubre stated that he did not expect the property to be developed in the next 5-20 years; however, the market did reflect that property was being purchased with an eye toward future development. Even the State’s expert, Ms. Reed, testified that, regarding plans such as the Marsh Management Plan in effect on the property, these plans were usually in place for a period of 20 years.
Oubre testified that the property was zoned by the Parish as W-l, classified as wetlands. Oubre stated that the zoning meant that if the landowners wanted to use the property for something other than wetlands, it would have to apply for a zoning change. In addition, the property was classified as federal wetlands, and therefore the landowners would be required to get a permit from the Corps of Engineers. In his opinion, the wetland classification was more of a legal feature than a physical feature.
| ^DOTD’s expert, Mr. Evans, also testified that permits were needed to develop the property, since it was classified as wetlands, and that this was a legal impediment to the development of the property. However, it was possible to obtain a permit to use the wetlands, depending on the use.[12] In this case, DOTD was required to and did obtain such a permit to construct the 1-310 interchange.
*168 Oubre opined that in this case, because of this property’s location and the general area’s concentration of population, this land had a greater potential for development than other land that was more remote. Parcel Two is bound by the western border of Jefferson Parish (bordered on the east by Orleans Parish); and lies in between two largely populated areas, the Greater New Orleans area and Baton Rouge, the state’s capital. Over the last fifty years, significant development has occurred in the wetlands along this corridor, necessitating the construction of 1-310 itself. This construction project itself evidences the future prognosticated by Mr. Oubre.
We find that the trial court could reasonably have concluded that the evidence supported a finding that the highest and best use for Parcel Two included a future speculative development component.
DOTD next alleges error in the trial court’s failure to specify the dimensions of its partitions in valuating severance damages to Parcel Two. In her judgment, the trial court found that severance damages to Parcel Two decreased as the property receded further north from that adjacent to developed property. DOTD objects to the trial court’s failure to include the specific acreage of each subdivided portion. We know of no statute or jurisprudence, nor does DOTD cite any, which would require such inclusion.
| ⅞,-jThe trial court’s conclusions in apportioning Parcel Two constitute her reasons for her evaluation of the property. The court’s findings need not include its reasons for judgment, LSA-C.C.P. art. 1917 B. A party may request written reasons within ten days after the rendition of the judgment. LSA-C.C.P. art. 1917 A. However, the reasons for judgment are not the judgment itself, (LSA-C.C.P. art. 1918), and appeals are taken from the judgment, not the written reasons for judgment. The written reasons are not binding on the appellate court. Dufresne v. Dufresne, 10-963 (La.App. 5 Cir. 5/10/11), 65 So.3d 749.
We therefore find no legal error in the trial court’s failure to include the dimensions in its portioning of Parcel Two.
As to the trial court’s analysis that Parcel Two West’s most southern land closest to 1-310 had greater value with value decreasing as one travels north and west from 1-310, we believe its conclusions are supported by the record. The trial court found that the pre-taking value of Parcel Two ranged from $800.00 to $500.00 an acre, instead of the $800.00 per acre for the entire amount of Parcel Two West. A review of the general map introduced into evidence, as well as the other evidence of topography and location, supports the rea-sonability of the trial court’s judgment in this regard. It is evident that the most northwestern portion of Parcel Two West was the most remote from access points prior to the taking, and also the most remote from the metropolitan area bordering the property. This supports a decreased value in the property’s highest and best use as future speculative development as one moves away from the metropolitan area and assuming that the property would be developed from the metropolitan area outward. Nevertheless, it was reasonable for the court to find that there was some future speculative value to the entire portion of the property because of its location | ?4and its accessibility. Therefore, the court was reasonable in assigning some loss of value to the entirety of the property when access was lost as a result of the taking.
In allegation of error five, DOTD argues that the trial court erred in awarding severance damages for the whole of Parcel *169 Two when the court did not accept the highest and best use for the entire Parcel Two. We find this to be a non-issue. DOTD presented this same argument during the hearing on its motion for new trial. The trial judge apologized for any confusion that her stated reasons in the judgment may have caused, explaining that “what I meant by that was only on that dollar valuation of Mr. Oubre, on that portion. I accepted his market speculation aspect on the entirety of Parcel 2, but I didn’t accept his $800.00 valuation for the entirety.” Thus, the trial court clearly explained that the highest and best use for all of Parcel Two was recreational wetlands and mineral production with a future speculation component, but that the actual pre-taking value of the three portions into which she broke Parcel Two West diminished as the land got further from 1-810 and closer to the railroad tracks and 1-10, to the northwest recesses of the property.
In its sixth allegation of error, DOTD alleges that the trial court erred in awarding severance damages for the remainder of Parcel Two East when none was requested by the landowners. DOTD contends that the landowners admitted that right of access existed for Parcel Two East and therefore no severance damages occurred. However, the trial court found severance damages warranted due to a combination of factors, namely loss of access and damage to the property caused by the increased salinity as a result of the construction of 1-810. There was significant testimony from the various landowners’ experts summed up by Mr. Oubre that the 1-810 construction damaged the land nearest the construction more than it would have been damaged by the other forces which had been brought toj^bear on the property. Therefore the trial court could have reasonably concluded that Parcel Two East sustained severance damages in the form of physical damages as a result of the increased salinity due to the construction project. This conclusion is bolstered by the fact that the trial court found these physical damages to only 109.26 of the Parcel Two acreage, including Parcel Two East and Parcel Two West.
Subsumed within DOTD’s first six assignments of error is a general complaint with the manner in which the trial court divided the property for purpose of its analysis and conclusions. The court divided the property into Parcels One East and West, Parcel Two East and West with a further discussion of Parcel Two West into three general portions and Parcel Three. In dividing the property for purposes of its analysis and conclusions, the trial court considered the testimony and evidence relative to proximity to Jefferson Parish, Baton Rouge, Lake Pontehartrain and indirect access to Airline Highway, as well as testimony regarding the manmade tran-sections on the property relative to Airline Highway, the proposed Hurricane Protection Levee, I — 10, the Illinois Central Railroad, the 1-310 exchange and the 1-310. Based upon the testimony introduced, we find that the trial court’s treatment of the property for purpose of analysis and conclusions was reasonable and well-founded.
Having considered the first six allegations of error concerning the manner in which the trial court approached the various portions of the property, the facts the trial court found and the factors the court considered relevant in valuing the property, we turn to the actual values the trial court placed on the various parcels.
Bennet Oubre testified that he was hired in 2004 to perform a retrospective analysis, to calculate the value of the landowners’ property at the date of the taking | gfiin 1987. Even in 1987 the property was located within the New Orleans Metropolitan statistical area.
*170 Oubre testified that his comparable sales of property in the area, for the most part, ranged from 1970 to 1983 and ranged from $2,700 to over $30,000 per acre. He also included DOTD’s purchase of a piece of property in 1966 for the construction of I-10 at $523.00 per acre. The property was a negotiated purchase, not an expropriation. Oubre said he included this purchase because it was inside the tract of property he was evaluating for this case. Oubre also considered LP & L’s 1975 negotiated right-of-way transfer with the Monteleones (some of the landowners in this case) for 75 acres at $896.00 per acre.
As discussed earlier, Oubre divided the property into three portions. The first piece of property that Oubre reviewed was that portion of the property south of the proposed levee, Parcel One. There had been actual development on that property by 1987. Oubre then designated Parcel Two as that portion north of the levee and south of the railroad tracks. This property had some development as well. Parcel Three was north of the railroad tracks.
The sample of land sales regarding Parcel One ranged from $8,500.00 to $30,000.00 per acre. Two properties in the immediate area of Parcel One were valued at $16,551.00 (Parcel 225) and $16,554.00 (Parcel 1714) per acre. Oubre concluded that the pre-taking value of the property within Parcel One was $16,552.00 per acre.
Regarding Parcel Two, Oubre found that in the early 1970s, people were buying property in the immediate area to hold for future development. In 1986, several sales north of Airline Highway reflected a purchase price of around $5,000.00 per acre. Giving some consideration to the fact that people will pay [ 27inore because there is current speculation activity, Oubre considered the before-taking value of the property in Parcel Two to be $800.00 per acre.
Oubre testified that he found Parcel Three’s highest and best use before the taking was recreational wetlands. Oubre testified that he reviewed 70-100 sales for wetland properties and found that the price per acre for those properties ranged from a low of $250.00 to a high of $1,200.00, with a concentration in the $300.00 to $500.00 per acre range. Oubre opined that the before taking value of the property in parcel Three was $500.00.
DOTD’s expert, Jack Evans, testified that he conducted the appraisals on every piece of property that DOTD attempted to or did acquire for the construction of I-310. He concluded that the highest and best use of the landowners’ property was for recreational wetlands, and he found nothing to segregate any part from the entirety of the ownership from the standpoint of highest and best use. Prior to the first trial, he had compiled a list of 57 sales that had occurred from 1984 to 2001, keeping in mind that the sales after 1987 were after the date of the taking and could only be used for trend analysis. He also opined that after 1978, the market reacted to additional burdens placed on wetlands by the federal government and reflected a downward trend in the value of wetlands. In reviewing his comparable sales, Evans concluded that the price of the wetlands was not differentiated by its quality (cypress swamp, fresh-water marsh, brackish marsh, or open water). Because the property’s highest and best use was wetland recreation, which remained the same before and after the taking, there were no severance damages.
Evans calculated the value of the property taken for DOTD in 1986, using five comparables. Each of the comparables used was comprised of property located in St. Tammany Parish, in the Honey Island Swamp area. Three of those five compa- *171 rabies involved sales of property to three brothers, executed on the same |2sday. Evans stated that his compilation of 57 sales supported his conclusion in 1986 that the value of the landowners’ property was $800.00 per acre.
The trial court found that the before value of the property in Parcel One was $16,552.00 and it awarded $188,574.64 for the 8.07 acres taken. The trial court found the before taking value of the property in Parcel Two consisted of a range of $800.00 to $500.00, and it awarded $35,509.50 for the 18.21 acres taken. And, the trial court found that the before taking value of the property in Parcel Three was $500.00 per acre, and it awarded $45,450.00 for the 90.9 acres taken. As we stated earlier, the trial court may give whatever weight it considered appropriate to any or all of the witnesses, and its conclusions are subject to the manifest error/abuse of discretion standards of review. After our review of the record, we cannot say that the trial court abused its discretion or committed manifest error in its valuation of the property before the taking, its valuation of the property taken and its valuation of the property remaining to the landowners after the taking.
Considering the first six allegations of error as urged by the DOTD, we find no legal error in the trial court’s judgment. In addition, given our review of the record, we cannot say that the trial court abused its discretion or committed manifest error in its rulings on the value of the property seized, or the value of severance damages to the landowners’ remaining property. These allegations are without merit.
In its seventh allegation of error, DOTD argues that the trial court improperly relied on Mr. Oubre’s testimony and evidence, in the form of oral appraisals, contending that such appraisals are inherently unreliable and not subject to disclosure at any time before the appraisal is made in open court.
In order to preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or | astestimony and state the reasons for the objection. The general rule is that a rule of evidence not invoked is waived, and, hence, a failure to object to evidence waives the objection to its admissibility. Smith v. Smith, 08-575 (La.App. 5 Cir. 1/12/10), 31 So.3d 453, 462. DOTD did not raise any objection to the oral appraisal at trial, accordingly this argument has been waived and we decline to consider it.
We also note that Oubre’s opinion was set forth extensively in his testimony at the 2006 trial, in which he testified at great length concerning his comparable sales and value conclusions, and that there were no material changes to his opinion as set forth in that testimony. Therefore, DOTD had ample notice before the second trial of the substance of Mr. Oubre’s testimony and opportunity at trial to impeach him regarding any inconsistencies between his first and second trial testimony.
In its eighth allegation of error, the DOTD alleges that the trial court erred in reversing its original judgment regarding calculation of interest from the date of the answer.
In her original judgment, the trial judge awarded interest from the date of filing of the landowners’ answer. On motion for new trial, the judge amended her judgment to award interest from the date of the taking.
At the time the petition was filed in this case, LSA-R.S. 48:455 provided that interest would accrue from the date of taking. LSA-R.S.48-.455 was amended in 1988 and, at the time of trial, provided that interest would accrue from the date of the answer. *172 Since LSA-R.S. 48:455 affects the substantive rights of the landowner in expropriation proceedings to just compensation for his property, the version of the statute in effect at the time of the DOTD’s filing of the expropriation proceeding applies. State Through Dept. of Transp. and Development v. Estate of Davis, 572 So.2d 39, 44 (La.1990). DOTD filed its petition for expropriation in 13n May of 1987. Accordingly, interest accrued as of that date. Thus we find no error in the trial court’s ruling granting the new trial for the purpose of ruling that interest would accrue from the date of taking.
In its ninth allegation of error, DOTD alleges that the trial court erred in awarding excessive attorney fees.
After a hearing, the trial court awarded attorney fees of $900,000.00. The DOTD argues that this amount is in excess of the 25% of the judgment cap provided in LSA-R.S. 48:458. The DOTD also argues that the amount of the award is excessive under the circumstances of this case, considering the results and the extent and character of the work performed.
LSA-R.S. 48:453 E provides that “[r]ea-sonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court.” This court has held that the compensation award also includes legal interest, and therefore attorney fees should be calculated on the difference between the amount deposited into the court and the amount awarded by the jury, plus interest on that difference. State, Dept. of Transp. and Development v. August Christina & Bros., Inc., 97-244 (La.App. 5 Cir. 2/11/98), 716 So.2d 372. The award in this case, considering the interest from the date of taking in 1987, was under the 25% cap set by LSA-R.S. 48:453.
DOTD also contends that the award was excessive under the circumstances of this case. Attorney fees in expropriation cases are discretionary with the trial court. Davis, supra; State, Dept. of Transp. and Development v. Williamson, 597 So.2d 439 (La.1992). Factors to be taken into consideration in determining the | S1 reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances made; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court’s own knowledge. These factors are derived from Rule 1.5(a) of the Rules of Professional Conduct, which guide the legal profession in setting reasonable attorney fees based on skill, prevailing charges, time involved, relationship, and others. Rivet v. State, Dept. of Transp. and Dev., 96-0145, p. 11 (La.9/5/96), 680 So.2d 1154, 1161-2; Williamson, supra.
In this case, testimony established that attorney fees of $873,430.00 were incurred if calculated on an hourly basis, not including the work performed in March of 2010 and thereafter. The work in March included the nine day trial and the post-trial motions after judgment. This case involved ten years of litigation and two trials, and involved complicated issues. Testimony at the hearing revealed that the attorneys involved were highly skilled, and the results they obtained for the landowners were very favorable. We cannot say that the trial judge abused her discretion in her award of attorney fees.
*173 In its tenth allegation of error, DOTD contends that the trial court erred in reimbursing the landowners for costs of a non-witness consultant.
In awarding costs, the trial court awarded costs for Jeff Hamill, who was a graphic design consultant who helped the landowners’ attorneys in preparing their cases. The landowners contend that this cost is sanctioned by LSA-R.S. 13:4533[13] Irrelative to assessing costs against the state, which provides for “all other costs allowed by the court.”
The trial judge has great discretion in awarding costs, and her assessment of costs can be reversed by the appellate court only upon a showing of an abuse of discretion. Rauch-Milliken Intern., Inc. v. Halprin, 09-723 (La.App. 5 Cir. 12/29/09), 30 So.3d 879, 882. The trial court has the discretion to tax as costs expert fees for preparatory, non-testifying expenses, in addition to costs for time spent testifying at trial. Lewis v. ODECO, Inc., 07-0497 (La.App. 4 Cir. 4/8/09), 12 So.3d 363, writ denied, 09-1386 (La.10/10/09), 19 So.3d 463, writ denied, 09-1425 (La.10/16/09), 19 So.3d 479, cert. denied, Diamond Offshore Drilling, Inc. v. Lewis, — U.S.-, 130 S.Ct. 1705, 176 L.Ed.2d 183, (2010).
At the hearing of this matter, the landowners’ attorney testified that Mr. Hamill spent 169 hours of trial preparation and design, in which he met with the experts and attorneys and was able to “streamline” the testimony for presentation to the court. Without this preparation by Mr. Hamill, the experts and the attorneys would have incurred additional time, and additional costs, in presenting this case. In addition, Mr. Hamill prepared the demonstratives that were presented in court and handled the audio-visual presentation during trial which streamlined the process. Considering the record before us, we cannot say that the trial court abused its discretion in its award of costs.
In its last allegation of error, DOTD alleges that the trial court erred in granting the landowners’ motion to strike the jury. This Court has already visited this issue on writ of review and found that the specific statutes on expropriation, which provide that the state is required to post a jury bond in expropriation proceedings, supersedes the general statutes that provide that the state is not required to post a bond. State, DOTD v. Monteleone, 10-231, (La.App. 5 Cir. | ;^3/22/01)(unpublished). This opinion will reexamine the issue, since that writ was denied, rendering the analysis dicta.
DOTD cites LSA-R.S. 13:4521, which exempts the DOTD from posting bond in any proceeding instituted by or against the state. However, LSA-R.S. 13:4521 provides that the state is not required to pay court costs “except as provided in R.S. 13:5112, R.S. 19:15 and 116 and R.S. 48:451.3”. LSA-R.S. 48:451.3 specifically requires DOTD to post bond in expropriation proceedings and provides that “[t]he court shall require any party, including the department, who demands a jury trial, to post a bond or other security as may be required in ordinary similar jury cases.”
Laws on the same subject matter must be interpreted with reference to each other. La. R.S. 1:13. Furthermore, where two statutes deal with the same subject matter and cannot be harmonized, the statute specifically addressing the matter at issue must prevail over the statute more *174 general in nature. August Christiana & Bros., Inc., supra. Accordingly, the rules set forth in Title 48 of the Revised Statutes prevail over the more general provisions found in Title 13 of the Revised Statutes.
In this appeal, DOTD suggests while the state may be taxed with the cost of a jury, those costs are deferred under LSA-R.S. 13:5112, and therefore the trial court erred in striking its jury for failure to post a bond. However, DOTD’s assertion is contrary to the legislature’s intent as expressed by Acts 1990, No. 133, which amended and reenacted both LSA-R.S. 13:4521 and 48:451.3, wherein it specifically states that the amendments were enacted, in part, to “require the expropriating authority to pay the cost of a jury trial when it has demanded the jury trial” and further to “require any party in quick taking expropriation proceedings instituted by the Department of Transportation and Development to post a bond or other security for a jury trial[.]”
| ^Accordingly, the trial court did not err in granting the motion to strike the jury.
LANDOWNERS’ ANSWER TO APPEAL
In their answer to DOTD’s appeal, the landowners seek an increase in the amount of attorney fees and costs incurred in this appeal. The landowners contend that they are entitled to an increase in attorney fees awarded by the trial court for defending DOTD’s appeal. An increase in attorney fees is usually awarded where a party who was awarded attorney fees by the trial court is forced to and successfully defends an appeal. State Dept. of Transp. and Development v. Brookhollow of Alexandria, Inc., 578 So.2d 558 (La.App. 3 Cir. 1991), writ denied, 581 So.2d 709, 710 (La.1991). The award of additional attorney fees is “to keep the appellate judgment consistent with the underlying judgment.” Goulas v. B & B Oilfield Services, Inc., 10-934 (La.App. 3 Cir. 8/10/11), 69 So.3d 750, 762, writ denied, 11-1951 (La.11/14/11), 75 So.3d 945. To determine the amount of attorney fees, factors that are considered include “the skill exercised by the attorney and the time and work required on appeal.” Avenue Surgical Suites v. Jo Ellen Smith Convalescent Center, 11-0026 (La.App. 4 Cir. 5/18/11), 66 So.3d 1103, 1111.
In this case, we are unable to conclude from the record the appropriate amount of additional fees to be granted in this case. Accordingly, we remand this matter for a hearing on the issue of attorney fees for this appeal.
CONCLUSION
For the above discussed reasons, the decision of the trial court is affirmed. The matter is remanded for a determination of attorney fees owed for this appeal. All costs are assessed against appellants.

AFFIRMED AND REMANDED

CHAISSON, J., dissents, in part, with reasons.

. LSA-R.S. 48:455 was amended by Acts 1988, No. 882, § 1; Acts 1992, No. 483, § 1; Acts 2006, No. 322, § 1, eff. July 1, 2006, after the filing of the petition in this case. See discussion, infra.

. The landowners consist of William A. Mon-teleone, Ruth Aleman Monteleone, David Gib-bens Monteleone Trust, Anne Hathaway Mon-teleone Trust, Frank Caffery Monteleone Trust, Christina Carol Monteleone Trust, the J. Edgar Monroe Foundation, Michael W. Burgess, William A. Monteleone, Jr., Dr. George E. Burgess III, George Burgess, Jr., Trust No. 2 and George Burgess, Jr., Trust No. 4. According to the landowners, the property is owned indivisión by the J. Edgar Monroe Foundation (25%), the Burgess Family (25%) and the Monteleone Family (50%).

. The access points were on paper off Alme-dia Road, which abuts Airline Highway, as described supra.

. Ensminger testified that DOTD had to obtain a permit from the Corps of Engineers for the 1-310 project. As part of the permit application, DOTD had to provide plans to mitigate any damage caused as a result of implementation of the project. Included in its mitigation process, DOTD was to construct three water control structures, or weirs, to reduce the saltwater intrusion onto the property. DOTD did construct the weirs; however they failed from the start.

. Although Oubre testified that 90.09 acres were taken, in actuality 90.90 acres were taken by the state. Thus, just compensation for Parcel Three was $45,450.00.

. Ms. Young testified that dendroecology is the study of tree rings, and that a dendroecol-ogist uses the growth, the ecology and morphology of a tree to document and study the environment and changes in the environment around that tree.

. Geomorphology is the study of the Earth's surface.

. Hydrology is the science dealing with the occurrence, circulation, distribution, and properties of the waters of the earth and its atmosphere.

. See footnote 5, supra.

. As explained supra, the pre-taking accesses of the property were proposed roadways which ran off of Almedia Road that had been dedicated but unimproved. These roadways ran perpendicular to Almedia Road and would have run under 1-310. Almedia Road gave access to Airline Highway. According to the landowners’ expert, Oubre, 1-310 cut off the dedicated and unimproved roadways which intersected with Almedia Road and gave access to Airline Highway. According to Oubre, since there was no provision for commercial or industrial access to these streets from one side of 1-310 to the other, everything west of 1-310 suffered from the lack of access.

. State, DOTD v. Scramuzza, 95-786 (La.App. 5 Cir. 4/30/96), 673 So.2d 1249.

. Mr. Evans testified that, in order to obtain a 404 permit from the federal government, a landowner had to establish that: 1) there was no other non-available wetland; 2) there was a need or necessity for the project; 3) the project will fill that need or necessity; and 4) there are no available lands that were not wetlands for the project.

. LSA-R.S. 13:4533 provides that "The costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.”